152 N.J. 86 (1997)
703 A.2d 901
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
P.Z., DEFENDANT-RESPONDENT.
The Supreme Court of New Jersey.
Argued October 8, 1996.
Decided November 26, 1997.
*91 Marc E. Roessler, Assistant Prosecutor, argued the cause for appellant (Daniel J. Carluccio, Ocean County Prosecutor, attorney; Mr. Roessler, Thomas M. Cannavo and Brent D. Miller, Assistant Prosecutors, on the briefs).
James K. Smith, Jr., Assistant Deputy Public Defender, argued the cause for respondent (Susan L. Reisner, Public Defender, attorney; Mr. Smith and James Pinchak, Assistant Deputy Public Defender, on the brief).
Peter D. Alvino, Deputy Attorney General, argued the cause for amicus curiae, New Jersey Division of Youth and Family Services (Peter Verniero, Attorney General of New Jersey, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel).
The opinion of the Court was delivered by PORITZ, C.J.
*92 We granted leave to appeal, 143 N.J. 480, 672 A.2d 1164 (1996), to consider whether a caseworker from the Child Protective Services Unit of the Division of Youth and Family Services ("DYFS" or "Division") must give Miranda warnings to a parent prior to a non-custodial interview related to a child abuse investigation. Defendant, P.Z., provided an inculpatory statement to a DYFS caseworker during an at-home interview conducted in the course of a Title Nine[1] inquiry. The caseworker reported the substance of the statement to the Ocean County Prosecutor's Office. When the prosecutor later filed criminal charges, defendant moved to suppress his statement. The trial court ruled defendant's statement inadmissible, and the Appellate Division affirmed. 285 N.J. Super. 219, 666 A.2d 1000 (1995). We reverse.

I
In November 1993, defendant's seven-week-old daughter, C.Z., was admitted to Jersey Shore Medical Center where she was diagnosed with and treated for "Shaken Baby Syndrome." Shaken Baby Syndrome was first recognized in the 1970s. Robin Elizabeth Margolis, Healthtrends, Healthspan, June 1994, at 21. Babies who have been grabbed by the chest or upper arms and violently shaken back and forth exhibit certain injuries characteristic of the syndrome. These babies may come to the attention of the medical community because of "projectile vomiting, sleepiness, poor appetite, eye hemorrhages, brain hemorrhages, and seizures." Ibid. Although they generally do not show signs of external injuries, babies who have been violently shaken may become severely brain-damaged or permanently blind. Some die. Ibid.; see also State v. Compton, 304 N.J. Super. 477, 485-87, 701 A.2d 468 (App.Div. 1997) (discussing recognition of Shaken Baby *93 Syndrome in "medical ... literature" and caselaw). C.Z. suffered from both old and new bleeding in the brain and from retinal bleeding in both eyes.
The hospital notified DYFS about C.Z.'s injuries as mandated by N.J.S.A. 9:6-8.10 when there is "reasonable cause to believe that a child has been subjected to child abuse." DYFS commenced a Title Nine investigation and reported the case to the Ocean County Prosecutor's Office. Initial interviews conducted by a DYFS caseworker with defendant, his wife, and defendant's father did not reveal a plausible explanation for C.Z.'s injuries. Shortly thereafter, on behalf of DYFS and pursuant to N.J.S.A. 9:6-8.21 to -8.73 and N.J.S.A. 30:4C-12, the Attorney General instituted a civil action against defendant and his wife. DYFS sought temporary custody of C.Z. and her then two-year-old sister, M.Z., on the grounds that C.Z. had been injured by "other than accidental means" and that the Division was unable to ascertain who had caused the child's injuries. N.J.S.A. 9:6-8.21. Defendant and his wife were represented by separate counsel in the Title Nine action.
The Chancery Division granted legal custody of both children to DYFS but gave physical custody of M.Z. to her paternal grandfather. C.Z. remained hospitalized. Two subsequent orders were entered in January and March. The first provided that M.Z. would remain with her paternal grandfather, that defendant and his wife would live at a different location and have no unsupervised contact with M.Z., that defendant would submit to a drug and alcohol evaluation, and that the couple would submit to counseling, psychiatric evaluation, and parenting skills classes. The second order directed DYFS to obtain recommendations from the treating therapist and from a physician about visitation and family reunification.
Shortly before April 5, 1994, defendant's wife informed her counselor that defendant had admitted causing C.Z.'s injuries. C.Z. had been hospitalized for five months and was expected to be released shortly. Her mother's statement was therefore critical to *94 the placement of both C.Z. and her older sister. DYFS caseworker Cheryl Ann Kobran attended a case planning conference with her supervisors and the Deputy Attorney General in charge of the Title Nine action to discuss how to proceed with the new information provided by defendant's wife. It was decided that Kobran should interview P.Z. after contacting the Ocean County Prosecutor's Office to determine whether the interview would impede any pending investigation by that office.
On the morning of April 5, Kobran spoke to Investigator Joseph Lazzaro at the Prosecutor's Office and advised him that she planned to interview P.Z. Investigator Lazzaro informed Kobran that, although the Prosecutor's Office could not interview defendant because he had a lawyer, there was no obstacle to DYFS questioning P.Z. Lazzaro then asked Kobran to report the results of her interview with defendant to the prosecutor.
Later that day, Kobran and another DYFS caseworker, Donna Martinez, made an unannounced home visit to defendant. Kobran had been working with the family and was familiar to P.Z. She told defendant she was there to ask him about his wife's statement that he had admitted causing his infant daughter's injuries. Defendant's father was present and Kobran asked him to leave the room because he was talking. The father complied with Kobran's request and waited outside on the front porch while Kobran completed the interview.
Defendant acknowledged that he knew why Kobran was there, but said his attorney had told him not to speak to anyone. Kobran nonetheless encouraged defendant to speak, telling him that she was there to complete the DYFS investigation and to decide where to place C.Z. upon her impending discharge from the hospital. The caseworker also indicated concerns about M.Z.'s placement because of the new information obtained from P.Z.'s wife. Defendant admitted causing C.Z.'s injuries by shaking the baby two or three times because she was crying and he could not console her. He said that he felt remorse for what had happened and that he deserved to be punished. Kobran advised defendant *95 that his statement would be turned over to the Prosecutor's Office and left with Martinez.
Almost six months later, on September 28, 1994, defendant was charged with two crimes of the second degree: endangering the welfare of a child, in violation of N.J.S.A. 2C:24-4a, and aggravated assault, in violation of N.J.S.A. 2C:12-1b(1). Defendant pled not guilty to the charges and his attorney moved to suppress his April 5 statement to Kobran. The Title Nine action concluded on February 10, 1995 when custody of C.Z. and M.Z. was granted to their mother.
A Miranda[2] hearing was held in May 1995. Defendant claimed that his rights, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, had been violated by the State. The trial court ruled that defendant's statement was inadmissible at his criminal trial. The court determined that defendant's Fifth Amendment rights had not been violated because Kobran's interview with defendant was non-custodial. However, the court considered that defendant had invoked his Sixth Amendment right to counsel when he told Kobran his attorney had advised him not to talk to her. The court found persuasive that a Title Nine action was pending, that counsel had been appointed for defendant, that the Prosecutor's Office was investigating the matter, and that the prosecutor had knowledge that the "interview [was] taking place."
The Appellate Division granted the State's motion for leave to appeal and affirmed the suppression of P.Z.'s statement. 285 N.J. Super. at 219, 666 A.2d 1000. The panel focused on the "serious personal consequences" that flowed from a Title Nine proceeding and concluded that "there was at least some coercive element in the environment of the situation confronting defendant" because "parallel civil and criminal systems [were] both operating against [him]." Id. at 227, 666 A.2d 1000. Despite "a paucity of case law" in support of its position, the court held *96 broadly that "fundamental fairness and ... the Title Nine objective of child protection" require that statements made to DYFS in the context of a "Title Nine investigation may not be used against a party in a criminal action unless there is advice of Miranda rights and the affording of the Sixth Amendment right to counsel." Id. at 229, 666 A.2d 1000.

II

-A-
The New Jersey Legislature has enacted two "separate and distinct" statutes to protect children from abuse and neglect and to provide for the termination of parental rights. New Jersey Div. of Youth & Family Servs. v. K.M., 136 N.J. 546, 558, 643 A.2d 987 (1994). Title Nine governs the adjudication of abuse and neglect cases, while Title Thirty sets forth the procedures for the permanent removal of children from their parents. See New Jersey Div. of Youth & Family Servs. v. E.B., 137 N.J. 180, 185, 644 A.2d 1093 (1994). The express purpose of Title Nine is to
provide for the protection of children under 18 years of age who have had serious injury inflicted upon them by other than accidental means. It is the intent of this legislation to assure that the lives of innocent children are immediately safeguarded from further injury and possible death and that the legal rights of such children are fully protected.
[N.J.S.A. 9:6-8.8.]
Because child abuse and neglect are often difficult to detect, Title Nine provides that "[a]ny person having reasonable cause to believe that a child has been subjected to child abuse or acts of child abuse" must inform DYFS[3] immediately. N.J.S.A. 9:6-8.10. *97 The Division is required to investigate the allegations, N.J.S.A. 9:6-8.11, -8.18; N.J.S.A. 30:4C-11, -12, and to take appropriate action to safeguard the child or children from further injury, N.J.S.A. 9:6-8.8, -8.11, -8.18. When warranted by the circumstances, DYFS may seek an order from the court placing the child in the protective custody of the State. N.J.S.A. 9:6-8.18.
At the preliminary stage, before a complaint is filed, Title Nine permits DYFS to identify less serious cases that are suitable for adjustment. N.J.S.A. 9:6-8.35. Upon written notice to the parent or guardian, the Division may then hold a preliminary conference to resolve such cases informally. Ibid. Statements made by a potential respondent at the preliminary conference are inadmissible in any later fact-finding hearing under Title Nine or in any criminal litigation prior to conviction. N.J.S.A. 9:6-8.36.
When a case is unsuitable for informal resolution, DYFS is authorized to originate proceedings by filing a formal complaint alleging abuse and neglect in the Superior Court, Chancery Division, Family Part. N.J.S.A. 9:6-8.33, -8.34. Within three days, the child's parent or guardian must appear in court, at which time the court is required to inform "the parent or guardian of his [or her] right to have an adjournment to retain counsel and consult with him [or her]." N.J.S.A. 9:6-8.43a. Indigent parents or guardians must be advised by the court of their right to apply for an attorney through the Office of the Public Defender. Ibid.; see also E.B., supra, 137 N.J. at 186, 644 A.2d 1093; New Jersey Div. of Youth and Family Servs. v. T.C., 251 N.J. Super. 419, 435, 598 A.2d 899 (App.Div. 1991), certif. denied, 146 N.J. 564, 683 A.2d 1160 (1992).
DYFS caseworkers maintain frequent contact with the family, meeting to discuss family history and dynamics, and ways to remediate problems leading to abuse or neglect. The Division may seek appropriate protective orders from the court requiring *98 supervised visitation and rehabilitative services for both parents and children. N.J.S.A. 9:6-8.18, -8.28, -8.31, -8.50e, -8.51, -8.58.
Title Nine contemplates criminal prosecution of acts of abuse and neglect that constitute crimes.[4]N.J.S.A. 9:6-8.36a specifically requires that DYFS "immediately report all instances of suspected child abuse and neglect ... to the county prosecutor." Likewise, once the Division files a child abuse complaint with the Family Part, the court must immediately send a copy of the complaint to the county prosecutor. N.J.S.A. 9:6-8.25a. Although DYFS records are subject to strict confidentiality requirements, an exception permits DYFS to provide information to law enforcement agencies investigating child abuse or neglect and to "[a] grand jury upon its determination that access to such records is necessary."[5]N.J.S.A. 9:6-8.10a(b)(2)(7). Title Nine also permits the prosecutor to institute a criminal action against the parent or guardian even as the child abuse action continues in the Family Part. N.J.S.A. 9:6-8.24d, -8.25c.
The Division's regulations set forth guidelines and establish procedures for determining which cases must be referred to the prosecutor's office and how referrals are to be made. N.J.A.C. 10:129-1.1 to -1.5. The caseworker must report matters involving: the death of a child; suspected sexual abuse; any injury or *99 condition requiring hospitalization or emergency room treatment; any injury requiring more than superficial medical attention (e.g., broken bones); repeated instances of physical violence committed against a child; substantial deprivation of necessary care over a period of time; or abandonment of a child. N.J.A.C. 10:129-1.3a(1)-(6). As soon as DYFS has information that the child's condition or injury fits one of the enumerated categories and "the caseworker has reason to believe that the condition or injury was not accidentally caused," a referral is required. N.J.A.C. 10:129-1.3d; see also N.J.A.C. 10:129-1.3e. If the prosecutor decides to bring a criminal case, the caseworker must be advised. N.J.A.C. 10:129-1.5c.

-B-
Justice O'Hern has spoken eloquently of the intrusion of the real world into "that model of the family that our popular culture portrays." New Jersey Div. of Youth and Family Servs. v. A.W., 103 N.J. 591, 599, 512 A.2d 438 (1986). In the real world children are abused and neglected, most often in their homes where we expect them to be kept safe from harm. Title Nine responds to the terrible reality that not all children are safe with their families by providing for the removal of abused and neglected children and for appropriate protective orders when necessary to ensure their safety. The inquiry in every case focuses on the best interests of the child.
At the same time, the goal of family rehabilitation and reunification  the return of the child to the family  is a priority "unless that goal is not in the best interest of the child." N.J.S.A. 30:4C-60. The goal recognizes both the value to children of being restored to their families when possible, and the rights of parents to be with and to raise their children. See In re Guardianship of J.C., 129 N.J. 1, 7-8, 608 A.2d 1312 (1992); A.W., supra, 103 N.J. at 599-600, 512 A.2d 438. The abused child's interest is paramount; only when the child can be protected within the family will *100 the parents' interest in the care and custody of their child also be realized.
The criminal justice system acts separately, but in tandem with the civil system, to investigate and prosecute those who abuse and neglect children. To the extent that the prospect of criminal prosecution serves as a deterrent to child abuse, the criminal justice system also protects children. See Douglas J. Besharov, Child Abuse: Arrest and Prosecution Decision-Making, 24 Am. Crim. L.Rev. 315, 321 (1986). In some cases, the offender's removal from the home by prosecutorial authorities is in the best interests of the child. Id. at 333.
This case requires us to consider the rights of a parent who is under investigation for child abuse by DYFS pursuant to Title Nine and who may be subject to criminal prosecution for the same abusive behavior.

III
The State contends that defendant's Fifth Amendment privilege against self-incrimination was not violated when he spoke to the DYFS caseworker on April 5, 1994. It is the State's position that the caseworker was not obligated to give Miranda warnings or, alternatively, to cease questioning defendant when he said that his lawyer told him not to speak to anyone. The State denies that defendant was coerced into admissions of child abuse by an implied threat that his children would not be returned unless he made a statement.

-A-
The Fifth Amendment privilege against self-incrimination, made applicable to the states through the Fourteenth Amendment, provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. As explained in Malloy v. Hogan, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653, 659 (1964), the Fifth Amendment protects "the right *101 of a person to remain silent unless he chooses to speak in the unfettered exercise of his own free will, and to suffer no penalty ... for such silence." It reflects our understanding that government is "constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against an accused out of his own mouth." Ibid.
In New Jersey, the privilege is derived from the common law and is codified in our statutes and rules. State v. Reed, 133 N.J. 237, 250, 627 A.2d 630 (1993); see N.J.S.A. 2A:84A-19; N.J.R.E. 503. Its importance is not diminished by the lack of specific constitutional articulation; rather, from colonial times, "New Jersey has recognized the right against self-incrimination and has consistently and vigorously protected that right." Reed, supra, 133 N.J. at 250, 627 A.2d 630.
A person invoking the privilege against self-incrimination may do so "`in any ... proceeding, civil or criminal, formal or informal, where the answers might tend to incriminate him in future criminal proceedings.'" Minnesota v. Murphy, 465 U.S. 420, 426, 104 S.Ct. 1136, 1141, 79 L.Ed.2d 409, 418 (1984) (quoting Lefkowitz v. Turley, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274, 281 (1973)); Banca v. Town of Phillipsburg, 181 N.J. Super. 109, 114-15, 436 A.2d 944 (App.Div. 1981); see New Jersey Div. of Youth & Family Servs. v. S.S., 275 N.J. Super. 173, 179, 645 A.2d 1213 (App.Div. 1994). However, the privilege is not self-executing under either federal or state law and must be invoked by anyone claiming its protection. Murphy, supra, 465 U.S. at 428-29, 104 S.Ct. at 1142-43, 79 L.Ed.2d at 419-20; Reed, supra, 133 N.J. at 251, 627 A.2d 630. Generally, when the privilege is not asserted and the person questioned chooses to answer, the choice to respond is considered voluntary. Murphy, supra, 465 U.S. at 429, 104 S.Ct. at 1143, 79 L.Ed.2d at 420; State v. Fary, 19 N.J. 431, 435, 117 A.2d 499 (1955).
As is well known, an exception to this general rule was created by the United States Supreme Court more than thirty years ago in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 *102 (1966), wherein the Court determined that a custodial interrogation by law enforcement officers is inherently coercive, automatically triggering the Fifth Amendment privilege against self-incrimination. "Miranda warnings" are now household words in the United States. Today even schoolchildren know that when a person in police custody is questioned by law enforcement, he must be told that he has the right to remain silent, that any statement he makes may be used against him, that he has the right to an attorney, and that if he cannot afford an attorney, one will be provided for him. Id. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706-07.
The predicate requirements of Miranda are that the defendant must be in custody and the interrogation must be carried out by law enforcement. Id. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. Miranda turns on the potentially inquisitorial nature of police questioning and the inherent psychological pressure on a suspect in custody. Id. at 445-58, 86 S.Ct. at 1612-19, 16 L.Ed.2d at 707-14. The rule Miranda enunciates is prophylactic, designed to overcome the singular problems associated with custodial interrogation after a defendant is arrested or otherwise confined. Murphy, supra, 465 U.S. at 433, 104 S.Ct. at 1145, 79 L.Ed.2d at 423; Beckwith v. United States, 425 U.S. 341, 346, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1, 7 (1976).

-B-
Defendant acknowledges he was not in custody when Cheryl Ann Kobran questioned him. We note that application of the totality of the circumstances test followed by both the federal and New Jersey courts would defeat a claim that he was in custody at the time of his interview. See Stansbury v. California, 511 U.S. 318, 322, 114 S.Ct. 1526, 1528-29, 128 L.Ed.2d 293, 298 (1994); State v. Pierson, 223 N.J. Super. 62, 67, 537 A.2d 1340 (App.Div. 1988). Under federal law, the "ultimate inquiry is simply whether there is a `formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, *103 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279 (1983) (internal quotation marks omitted). Our courts have also recognized that "custody in the Miranda sense does not necessitate a formal arrest, `nor does it require physical restraint in a police station, nor the application of handcuffs, and may occur in a suspect's home or a public place other than a police station.'" State v. Lutz, 165 N.J. Super. 278, 285, 398 A.2d 115 (App.Div. 1979) (quoting State v. Godfrey, 131 N.J. Super. 168, 175, 329 A.2d 75 (App.Div. 1974)), aff'd, 67 N.J. 267, 337 A.2d 371 (1975). The critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors. See State v. Coburn, 221 N.J. Super. 586, 596-97, 535 A.2d 531 (App.Div. 1987), certif. denied, 110 N.J. 300, 540 A.2d 1281 (1988); In re A.B., 278 N.J. Super. 380, 384, 651 A.2d 118 (Ch.Div. 1994); see also J.F. Ghent, What Constitutes "Custodial Interrogation" Within Rule of Miranda v. Arizona Requiring That Suspect be Informed of His Federal Constitutional Rights Before Custodial Interrogation, 31 A.L.R.3d 565, 577 (1970).
The circumstances surrounding defendant's interview on April 5 fail to demonstrate the coercive atmosphere and restraint of freedom that comprises a custodial interrogation. Defendant was interviewed in his home, during the day, with his father nearby. He had complete freedom to come and go as he pleased. Although two caseworkers were present, he was questioned by only one, Kobran, with whom he was familiar. The caseworker's questions were not threatening and the interview was not lengthy. In short, none of the indicia of coercion were present in the circumstances of the interview.
Because defendant was not in custody when he was questioned by Kobran, we need not reach the question whether Kobran was acting as a law enforcement officer. This case is thus distinguishable from the two previous New Jersey cases which held that *104 DYFS workers were acting as law enforcement officers when they questioned defendants who were incarcerated. See State v. Helewa, 223 N.J. Super. 40, 537 A.2d 1328 (App.Div. 1988); State v. Flower, 224 N.J. Super. 208, 539 A.2d 1284 (Law Div. 1987), aff'd, 224 N.J. Super. 90, 539 A.2d 1223 (App.Div. 1988). In Helewa, supra, the defendant had been advised of his Miranda rights upon his arrest for sexually assaulting his two daughters. 223 N.J. Super. at 42, 537 A.2d 1328. He was subsequently interviewed by a caseworker while incarcerated in the Middlesex County Adult Corrections Center. Ibid. The court held that "the DYFS caseworker must be equated with a law enforcement officer for purposes of Miranda when conducting a custodial interview." Id. at 52, 537 A.2d 1328. Similarly, in Flower, supra, the defendant was interviewed by a caseworker when he was incarcerated in a county jail after having been arrested and charged with the sexual assault of a three-and-a-half year old child. 224 N.J. Super. at 211, 539 A.2d 1284. After observing, "[i]t is not all questioning by a social service worker that will constitute acting in a law enforcement capacity," id. at 218, 539 A.2d 1284, the court held that, in the circumstances, the caseworker should have given the defendant Miranda warnings, id. at 220, 539 A.2d 1284. In both cases, the defendants had been arrested and confined at the time of the interviews.
Defendant claims he "did not lose all of his Fifth Amendment protections simply because he was not in custody at the time he was questioned." He asserts that the privilege against self-incrimination applied to the DYFS interview and that he properly invoked the privilege when he stated that his attorney had advised him not to speak with Ms. Kobran. Certainly, defendant retained his Fifth Amendment protections during his interview with Kobran. The question is whether, in the circumstances, Miranda warnings were required or whether it rested with defendant to assert his privilege. See Murphy, supra, 465 U.S. at 429-30, 104 S.Ct. at 1143-44, 79 L.Ed.2d at 420-21. If Miranda warnings were required, defendant's reference to his attorney's advice *105 would have been tantamount to an invocation of his right to remain silent.
Again, despite defendant's assertions to the contrary, the issue turns on his non-custodial status. Had defendant been in custody at the time of the interview, under New Jersey law his "request, `however ambiguous,' to terminate questioning" would have been sufficient to trigger his right to remain silent. State v. Hartley, 103 N.J. 252, 263, 511 A.2d 80 (1986) (quoting State v. Kennedy, 97 N.J. 278, 288, 478 A.2d 723 (1984)). Likewise, his invocation of the right to counsel "need not [have been] articulate, clear, or explicit ...; any indication of a desire for counsel, however ambiguous, will trigger entitlement to counsel." Reed, supra, 133 N.J. at 253, 627 A.2d 630 (observing also that "the state right against self-incrimination is based on the understanding that the privilege is defined by ... ancillary rights, like the right to counsel during custodial interrogation"); see also State v. Chew, 150 N.J. 30, 63, 695 A.2d 1301 (1997) (holding that "defendant's request that his mother contact his attorney was an equivocal invocation of the right to counsel that had to be clarified before questioning could take place").
However, defendant was not in custody when he answered the caseworker's questions. Although he was free to remain silent and to insist upon having his lawyer present, the circumstances were not such as to require Kobran to stop the interview when defendant said that his lawyer had advised him not to discuss the matter with anyone. Later P.Z. testified at his suppression hearing that he had an agreement with his wife to inform DYFS "[t]hat I shook the baby." P.Z.'s version of the events leading up to and including the interview with Kobran confirm that defendant had decided, prior to Kobran's visit, and irrespective of his lawyer's admonition, to admit shaking his daughter. That decision was his to make.
We conclude that defendant's reference to his attorney did not, in this setting, invoke his right to remain silent such that Kobran was required to terminate the interview.

*106 -C-
Custodial interrogations by law enforcement officers are not the only special circumstances in which the Fifth Amendment privilege against self-incrimination is self-executing. Murphy, supra, 465 U.S. at 434, 104 S.Ct. at 1145-46, 79 L.Ed.2d at 423-24. Both the United States Supreme Court and our New Jersey courts have consistently held that the state may not force an individual to choose between his or her Fifth Amendment privilege and another important interest because such choices are deemed to be inherently coercive. See Lefkowitz v. Cunningham, 431 U.S. 801, 805-08, 97 S.Ct. 2132, 2135-37, 53 L.Ed.2d 1, 6-9 (1977) (holding unconstitutional statute that required political party officer to testify without immunity before grand jury or forfeit his office and be barred from holding another party office); Turley, supra, 414 U.S. at 75-84, 94 S.Ct. at 321-25, 38 L.Ed.2d at 281-85 (holding unconstitutional statute that compelled public contractors to testify without immunity concerning their state contracts or forfeit those contracts and be disqualified from future state dealings); State v. Clark, 58 N.J. 72, 83-92, 275 A.2d 137 (1971) (holding both Fifth Amendment and public policy require that neither unmarried welfare applicant nor father of her children could be prosecuted for fornication where applicant was required to institute bastardy proceedings against father to obtain benefits); Hirsch v. New Jersey State Bd. of Med. Exam'rs, 252 N.J. Super. 596, 605-09, 600 A.2d 493 (App.Div. 1991) (holding physicians could not be compelled to answer questions about drug use upon threat of suspension or non-renewal of medical license without accord of immunity), aff'd, 128 N.J. 160, 607 A.2d 986 (1992); see also Garrity v. New Jersey, 385 U.S. 493, 499-500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562, 566-67 (1967) (holding that, consistent with guarantees of Fourteenth Amendment, State may not compel police officers to answer work-related questions or lose their employment). These cases are based on the principle that the Fifth Amendment is violated "when a State compels testimony by threatening to inflict potent sanctions unless the constitutional *107 privilege is surrendered." Cunningham, supra, 431 U.S. at 805, 97 S.Ct. at 2135, 53 L.Ed.2d at 7.
In this case, defendant asserts that his statement was obtained in a similarly coercive manner because he was faced with an implied threat that his children would not be returned unless he admitted responsibility for his youngest daughter's injuries. Defendant testified that "someone," not Kobran or Martinez, had advised him and his wife that "we would get our children back if one of us would confess  whether we did it or not  to the injuries." This "someone," it is claimed, placed undue pressure on defendant to admit child abuse in order to regain custody of his children.
We begin with the general observation that, by acknowledging their abusive behaviors, parents can begin to understand and reform those behaviors, and that acknowledgment is an important step in the rehabilitation of the family. See In re H.R.K., 433 N.W.2d 46, 50 (Iowa.Ct.App. 1988) ("[T]he requirement that the parents acknowledge and recognize the abuse before any meaningful change can occur is essential to meeting the child's needs."); In re S.A.V., 392 N.W.2d 260, 264 (Minn. Ct. App. 1986) ("The trial court's finding that the parents need to recognize the cause of the children's injuries before any meaningful change can occur recognizes that a parent who acknowledges the need for professional help is more amenable to treatment than one who denies the need for such help."). At P.Z.'s suppression hearing, the DYFS caseworker confirmed the view that "in general" parental counseling is more effective when the parents "admit what they did wrong" and that parents who are trying to deal with their problems "ultimately do better in getting their children back." Her understanding is supported by theories about rehabilitation in other contexts. See, e.g., State v. Leggeadrini, 75 N.J. 150, 160, 380 A.2d 1112 (1977) (discussing criminal defendant's amenability to rehabilitation upon "acknowledgment of grievous wrongdoing" as mitigating factor to be taken into account in sentencing).
*108 Although an admission of abuse may aid in the rehabilitative process, termination of custody is not automatic on invocation of the privilege. We therefore consider inapplicable those cases holding unconstitutional a requirement that an individual choose between the right to remain silent and another vital interest. We note that the Supreme Courts of Minnesota and Vermont have reached similar conclusions. See In re J.W., 415 N.W.2d 879 (Minn. 1987); In re M.C.P., 153 Vt. 275, 571 A.2d 627 (1989). In In re J.W., supra, the Minnesota Supreme Court was confronted with "a court-ordered treatment plan requiring [the parents of neglected children] to make incriminating disclosures as part of their rehabilitation therapy." 415 N.W.2d at 880. When the parents invoked their Fifth Amendment privilege, the state's attorney indicated his intention to file for termination of parental rights. Id. at 882. "This threat," the court said, "is genuine, direct, and immediate, and the penalty threatened is a `potent sanction.'" Ibid. (citing Cunningham, supra, 431 U.S. at 805, 97 S.Ct. at 2135, 53 L.Ed.2d at 7). The court held that the order of the lower court, "to the extent it requires appellants to incriminate themselves, violates [their] Fifth Amendment rights and is unenforceable."
The Minnesota Supreme Court's holding is consistent with the decisions of the United States Supreme Court and this Court in cases where individuals were compelled to testify or lose a previously held benefit. See supra at 106-107, 703 A.2d at 911-912. Of particular relevance to this case, however, is the court's further discussion about the scope of the privilege when there is no direct threat but, instead, a possibility that therapeutic outcomes will be determinative of parental rights. The court considered the parents' choice whether or not to admit abuse unprotected by the Fifth Amendment:
While the state may not compel therapy treatment that would require appellants to incriminate themselves, it may require parents to otherwise undergo treatment. Therapy, however, which does not include incriminating disclosures, may be ineffective; and ineffective therapy may hurt the parents' chances of regaining their children. These consequences lie outside the protective ambit of the Fifth Amendment.
........

*109 ... In the lexicon of the Fifth Amendment, the risk of losing the children for failure to undergo meaningful therapy is neither a "threat" nor a "penalty" imposed by the state. It is simply a consequence of the reality that it is unsafe for children to be with parents who are abusive and violent.
[In re J.W., supra, 415 N.W.2d at 883-84 (footnote omitted).]
Certainly, the state could decide in a particular case that a parent should be compelled to speak to a counselor, with the result that any incriminating statement could not later be used in a criminal prosecution. As the dissent points out, infra at 129-130, 703 A.2d at 923 (Pollock, J., dissenting), the Minnesota Court recognized that this is a choice left to the state. In discussing this issue, however, the dissent confuses the public policy choice faced by the State with the legal issue of admissibility. Ibid.
P.Z. was not asked to choose between his children and the exercise of his right to remain silent. If he abused his daughter, and if he refused to acknowledge his acts of abuse, he would find it difficult to demonstrate that he could care for his children without harming them. This was the risk he faced. Kobran did not threaten him with termination of his parental rights if he did not confess; nor did she tell him that the only way he could get his children back was to confess. We conclude that defendant's statement to Kobran was not coerced in violation of his Fifth Amendment privilege against self-incrimination.

IV
The State also claims that defendant's April 5 statement was not obtained in violation of his Sixth Amendment right to counsel. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. Once the right to counsel has attached, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment," Kirby v. Illinois, 406 U.S. 682, 688-89, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411, 417 (1972), it can be exercised by the accused at all critical stages of a criminal proceeding, see White v. Maryland, *110 373 U.S. 59, 59-60, 83 S.Ct. 1050, 1051, 10 L.Ed.2d 193, 194 (1963), including questioning by law enforcement personnel, Brewer v. Williams, 430 U.S. 387, 397-401, 97 S.Ct. 1232, 1239-41, 51 L.Ed.2d 424, 436-38 (1977).
The right to counsel embodied in Article I, Paragraph 10 of the New Jersey Constitution is virtually identical to the Sixth Amendment right to counsel, and similarly attaches upon the return of an indictment or like process because, prior to that point in time, "the State's investigative effort ... is at a preliminary stage, ... the police may still be attempting ... to solve the crime[,] ... [and] the State's decision to prosecute has not solidified." State v. Tucker, 137 N.J. 259, 290, 645 A.2d 111(1994), cert. denied, 513 U.S. 1090, 115 S.Ct. 751, 130 L.Ed.2d 651 (1995). Tucker fixes upon the return of the indictment because that event
transforms the relationship between the State and the defendant. By obtaining the indictment, the State represents that it has sufficient evidence to establish a prima facie case. Once the indictment is returned, the State is committed to prosecute the defendant.
[Id. at 287, 645 A.2d 111 (quoting State v. Sanchez, 129 N.J. 261, 276, 609 A.2d 400 (1992)).]
Although this Court has held that the right to counsel found in Article I, Paragraph 10 of the New Jersey Constitution can provide greater protection than the Sixth Amendment right to counsel, see Sanchez, supra, 129 N.J. at 275-77, 609 A.2d 400, we have read Article I, Paragraph 10 as consonant with the Federal Constitution on the issue of when the right to counsel is triggered, Tucker, supra, 137 N.J. at 291, 645 A.2d 111.
In this case, when defendant was interviewed by Kobran on April 5, 1994, he was not the subject of a criminal prosecution since, at that time, he had not been arrested, indicted or arraigned. It was not until September 28, 1994, almost six months after Kobran questioned P.Z., that an indictment was issued against him. During the pre-indictment period of criminal investigation, a law enforcement officer could have questioned defendant without implicating his Sixth Amendment or Article I right to counsel. See Kirby, supra, 406 U.S. at 688-89, 92 S.Ct. at 1881-82, 32 *111 L.Ed.2d at 417; Tucker, supra, 137 N.J. at 290-91, 645 A.2d 111. It follows that an interview by a social worker would not trigger the right to counsel during this period.
The court below extended the Sixth Amendment right to counsel to Title Nine civil actions in which a complaint has been filed. However, the right to counsel guaranteed by both the Sixth Amendment and Article I applies by its terms to criminal prosecutions only. See Gideon v. Wainwright, 372 U.S. 335, 339-45, 83 S.Ct. 792, 794-97, 9 L.Ed.2d 799, 802-06 (1963) (recognizing Sixth Amendment right to counsel extends to state criminal prosecutions); Johnson v. Zerbst, 304 U.S. 458, 462, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461, 1465 (1938) (applying Sixth Amendment right to counsel in federal criminal prosecution); Tucker, supra, 137 N.J. at 287, 645 A.2d 111 (applying Article I right to counsel in criminal prosecution); Sanchez, supra, 129 N.J. at 276-77, 609 A.2d 400 (same). Defendant nonetheless suggests that his fundamental interest in the care and custody of his children, see Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599, 606 (1982); In re Promulgation of Guardianship Servs. Regs., 103 N.J. 619, 634, 512 A.2d 453 (1986), either requires counsel to be present when defendant is questioned by DYFS or requires his comment about his lawyer's advice to be considered an invocation of the right to counsel. Whether the question is framed in terms of rights ancillary to the right to remain silent, see Reed, supra, 133 N.J. at 250-53, 627 A.2d 630, or in terms of the Article I, Paragraph 10 right to counsel, we decline to expand the rights of Title Nine respondents to include protections accorded criminal defendants after they have been indicted or taken into custody.
Title Nine does not limit the use of statements made by respondents except where DYFS holds an informal preliminary conference in less serious cases. See N.J.S.A. 9:6-8.36 (prohibiting admission "into evidence" at Title Nine hearing or in criminal trial of statements made during preliminary conference). The statute contemplates that cases involving "imminent physical harm or actual physical harm" will be directed to the Superior Court "on *112 a priority basis." N.J.S.A. 9:6-8.35f. Title Nine specifically requires the court to advise parents of their right to counsel at the first hearing after DYFS files a complaint in Superior Court alleging abuse and neglect. N.J.S.A. 9:6-8.43a. This requirement ensures that parents have a meaningful opportunity to be heard during Title Nine proceedings and that their fundamental interest in the custody and care of their children is protected.
Presumably, the Legislature considered that the right to counsel set forth in the statute provides safeguards sufficient to protect persons alleged by DYFS to have abused or neglected their children. In contrast, the Appellate Division imported Sixth Amendment protections into Title Nine civil proceedings. Defendant asks us to do the same. He asserts "that [because] both the governing statutes and our own State Constitution envision a right to counsel once a complaint has been filed in a Title Nine case," he is entitled to have counsel present whenever a DYFS caseworker conducts a child abuse investigation.
In our view, acceptance of defendant's argument would shift the primary focus of Title Nine from the right of children to be protected from abuse and neglect to the right of parents to the custody of their children. Those rights are not in equipoise. Only when the family can be rehabilitated and the children safely returned can the parents' rights be fully realized. There is in these cases a complex of interests to be considered, suggesting to a court that some caution is appropriate. Forcing a DYFS caseworker to choose between providing Miranda warnings and foreclosing the use in criminal proceedings of information obtained in the course of an abuse and neglect investigation will not inure to the protection of children. We decline to tip the balance by requiring additional protections for the parents of abused children to be imported from our criminal jurisprudence into Title Nine proceedings.

V
The State also asserts that suppression of defendant's statement to Kobran is not required by the Due Process Clause of *113 the Fourteenth Amendment of the United States Constitution because defendant made the statement voluntarily. Long before Miranda v. Arizona, supra, the United States Supreme Court held that certain "interrogation techniques ... are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause." Miller v. Fenton, 474 U.S. 104, 109, 106 S.Ct. 445, 449, 88 L.Ed.2d 405, 410 (1985) (citing Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936)). Miranda established a per se rule to counteract the inherently coercive nature of custodial interrogations by law enforcement; it did not eliminate the due process requirement that all statements given during an interrogation must be voluntary. See id. at 109-10, 106 S.Ct. at 449, 88 L.Ed.2d at 410-11.
To determine whether a statement was made voluntarily, both the federal and New Jersey courts consider whether it was "the product of an essentially free and unconstrained choice by its maker," in which case the statement may be used against the defendant, or whether the defendant's "will has been overborne and his capacity for self-determination critically impaired," in which case use of the statement "offends due process." Schneckloth v. Bustamonte, 412 U.S. 218, 225-26, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 862 (1973); see State v. Galloway, 133 N.J. 631, 654, 628 A.2d 735 (1993). This issue can be resolved only after an assessment of the "totality of the circumstances" surrounding the statement. Arizona v. Fulminante, 499 U.S. 279, 285-86, 111 S.Ct. 1246, 1251-52, 113 L.Ed.2d 302, 315 (1991); Galloway, supra, 133 N.J. at 654, 628 A.2d 735 (observing also that, in New Jersey, the State must prove voluntariness beyond a reasonable doubt). This test is much like the test used to determine whether a defendant is in custody under the Fifth Amendment, except that a voluntariness review includes consideration of "both the characteristics of the accused and the details of the interrogation." Schneckloth, supra, 412 U.S. at 226, 93 S.Ct. at 2047, 36 L.Ed.2d at 862; see also State v. Miller, 76 N.J. 392, 402, 388 A.2d 218 (1978) (listing relevant factors such as "age, *114 education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment or mental exhaustion was involved").
P.Z. claims that his statement was not made voluntarily. He relies on two cases in which confessions were suppressed after specific threats by police officers that a defendant's children would be taken away. In Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), the defendant made an oral admission during the course of an arrest. The admission was procured after the arresting officers told the defendant "that state financial aid for her infant children would be cut off, and her children taken away from her, if she did not `cooperate.'" Id. at 534, 83 S.Ct. at 920, 9 L.Ed.2d at 926. The Court described the circumstances of the arrest as follows:
These threats were made while she was encircled in her apartment by three police officers and a twice convicted felon who had purportedly "set her up." There was no friend or advisor to whom she might turn. She had had no previous experience with the criminal law, and had no reason not to believe that the police had ample power to carry out their threats.
[Ibid.]
The Court held that a confession made under such circumstances was coerced and could "not be deemed `the product of a rational intellect and a free will.'" Ibid. (citation omitted).
Similarly, in United States v. Tingle, 658 F.2d 1332 (9th Cir.1981), the court held that a confession obtained after FBI Special Agents led defendant to believe that "she would never see her son again," id. at 1334 n. 2, was coerced even though the defendant signed a "standard FBI Advice of Rights form," id. at 1333. The interrogation was conducted by two agents in their car. They told defendant that she faced a maximum of forty years imprisonment for the crimes of which she was suspected. Id. at 1336. One of the agents used his knowledge that the defendant had a two-year-old child to suggest to the defendant that "she had `a lot at stake.'" Id. at 1334. The court found that "the purpose and objective of the interrogation was to cause Tingle to fear that, if *115 she failed to cooperate, she would not see her young child again for a long time." Id. at 1335. Applying the totality of the circumstances analysis, the court concluded that Tingle's confession was "not `the product of a rational intellect and free will' and was involuntary." Id. at 1337 (citation omitted).
The circumstances in Lynumn and Tingle are distinguishable from the circumstances in this case. Here, in examining the relevant characteristics of the accused, we find that defendant had obtained a high school equivalency diploma and was employed. He was represented by counsel in the Title Nine proceedings and was assured of a hearing on the issue whether the family should be reunited. Although defendant claims that he feared his children would not be returned if he did not confess, his subjective fear did not derive from a threat amounting to coercion under the Fifth Amendment. A defendant's state of mind is not dispositive of whether that defendant's "will has been overborne and his capacity for self-determination critically impaired." Schneckloth, supra, 412 U.S. at 225, 93 S.Ct. at 2047, 36 L.Ed.2d at 862.
Defendant was not in custody when he was interviewed, and his statement was not obtained in a coercive environment. A caseworker with whom he was familiar questioned defendant in his home, with his father nearby. Defendant was free to ask Kobran and Martinez to leave, and did not suggest that they do so. Most important, defendant had a lawyer in the Title Nine proceeding who had advised him not to speak. He chose not to take that advice after discussion with his wife and joint agreement to a "plan" by which he would admit to acts of abuse.
The sole purpose of the interrogations conducted in Lynumn and Tingle was to aid law enforcement in preparing a criminal case against defendants. The officers in those cases frightened the defendants into confessing by threatening them with the loss of their children. The circumstances of this case are markedly different. As we have previously discussed, the Division's objective is to protect children from abuse and neglect and not to promote law enforcement. Kobran's purpose in urging defendant *116 to cooperate and to talk about how the injury to C.Z. occurred was salutary: she sought information in aid of C.Z.'s placement.
Child abuse investigations are emotionally charged and difficult. They are critical to the child who has been or may be injured. Too often there is no explanation for serious injuries, and the child's parents are the focus of the inquiry. The Division cannot make decisions about uniting the family or alternative placement without thoroughly investigating whether it is safe to return the child to the home environment. Toward this end, DYFS caseworkers conduct home visits and interview parents in order to probe into the origins of the child's injuries. That is what the Division did in this case.[6]
We emphasize that Kobran's discussion with the Prosecutor's Office prior to her visit to P.Z. was intended solely to find out whether the visit would impede any investigation by that office, and not to further the prosecutor's investigation.[7] In the totality of these circumstances  primarily, defendant's level of education and his representation by counsel in the Title Nine proceedings, the atmosphere in which the interview was conducted, and Kobran's purpose in conducting the interview  we hold that defendant's statement was voluntary.[8]

*117 VI
The Appellate Division held that "fundamental fairness" and "the Title Nine objective of child protection" prevent the use of "statements to DYFS during the pendency of the Title Nine investigation ... against a party in a criminal action unless there is advice of Miranda rights and the affording of the Sixth Amendment right to counsel." 285 N.J. Super. at 229, 666 A.2d 1000. We have, however, determined that the Title Nine right to counsel adequately protects parents' fundamental interest in the care and custody of their children. We decline to apply the doctrine of fundamental fairness to require any additional procedural safeguards not now required by constitution or statute.
New Jersey's doctrine of fundamental fairness "`serves to protect citizens generally against unjust and arbitrary governmental action, and specifically against governmental procedures that tend to operate arbitrarily.'" Doe v. Poritz, 142 N.J. 1, 108, 662 A.2d 367 (1995) (quoting State v. Ramseur, 106 N.J. 123, 377, 524 A.2d 188 (1987) (Handler, J., dissenting)). In those rare cases where government action does not comport with "commonly accepted standards of decency of conduct to which government must adhere," State v. Talbot, 71 N.J. 160, 168, 364 A.2d 9 (1976), and where existing constitutional protections do not provide adequate safeguards, this Court has not hesitated to declare that government must be restrained, see Poritz, supra, 142 N.J. at 108, 662 A.2d 367 (discussing cases in which fundamental fairness has been used to require procedural protections that were "not constitutionally compelled"); Bruce D. Greenberg, New Jersey's "Fairness *118 and Rightness" Doctrine, 15 Rutgers L.J. 927, 945-46 (1984) (analyzing this Court's use of fairness and rightness doctrine to provide protections "beyond what due process demands").
The doctrine of fundamental fairness has supported procedures to protect the rights of defendants at various stages of the criminal justice process, even when such protections are not constitutionally required. This Court has also applied standards of decency and fairness to governmental action that is constitutional but that, nonetheless, includes elements of oppression or harassment requiring court intervention. Poritz, supra, 142 N.J. at 108-09, 662 A.2d 367. The "common denominator" in our cases is a threshold determination that someone has been or may be "subjected to potentially unfair treatment and there was no explicit statutory or constitutional protection to be invoked" against that treatment. Id. at 109, 662 A.2d 367.
Thus, fundamental fairness "prohibits conduct by law enforcement officials that perverts the judicial process and turns it into a prosecutorial tool." State v. Sugar, 84 N.J. 1, 14, 417 A.2d 474 (1980). In cases where there is an interrelationship between criminal and civil actions against the same person, courts must be "sensitive to the potential for the State's deliberately manipulating a civil procedure in order to obtain evidence against a criminal defendant." State v. Kobrin Securities, Inc., 111 N.J. 307, 317, 544 A.2d 833 (1988). In Kobrin Securities, this Court expressed concern that the civil discovery process not be used to compel a defendant to provide information in support of the State's case in a parallel criminal proceeding. We concluded that the use of information so obtained would constitute "such unfairness and want of consideration for justice as to require reversal." Ibid. (citations and internal quotations marks omitted).
In child abuse cases DYFS, the civil authority, must provide information about suspected abuse and neglect to the county prosecutor, the criminal authority. N.J.S.A. 9:6-8.36a. By regulation, the prosecutor is required to consult with DYFS about whether a criminal investigation is necessary and to inform DYFS *119 when a decision is made to initiate criminal proceedings. N.J.A.C. 10:129-1.5c; see supra at 98-99, 703 A.2d at 907-908. This relationship between DYFS and the prosecutor concerned the Appellate Division in this case and in Helewa, supra. We reject the contention that because "parallel civil and criminal systems are both operating against a defendant at the inception of proceedings in either court," State v. P.Z., supra, 285 N.J. Super. at 227, 666 A.2d 1000, P.Z. must be accorded rights not now required by constitution or statute. We are sensitive to the potential for manipulation adverted to in Kobrin Securities but do not find it in the exchange of information between DYFS and the prosecutor. Indeed, under this system, the requirement that the prosecutor seek input from DYFS may well work to a defendant's advantage in those cases where keeping the family together is in the best interest of the child. This relationship between the civil and criminal authorities does not demonstrate "such unfairness and want of consideration for justice" that defendant's statement to Kobran must be suppressed. Kobrin Securities, supra, 111 N.J. at 317, 544 A.2d 833 (internal quotation omitted).
We base this conclusion on the total circumstances of P.Z.'s interview. Defendant was not subjected to arbitrary procedures that were oppressive, harassing or that egregiously deprived him of his rights, either to remain silent or to have the custody and care of his children. At the time of the interview, Kobran was acting within the scope of her duties to investigate and establish a placement plan for defendant's infant daughter who was shortly to be released from the hospital. We have previously described the particulars of the interview, concluding that it was neither oppressive nor coercive. Kobran's purpose in conducting the interview was never challenged by defendant: she wanted to hear his response to his wife's allegations so that she would be better able to decide where to place defendant's daughter on her imminent release from the hospital. It was certainly possible that defendant would deny shaking his daughter or even that he would claim his wife had abused C.Z.
*120 Most important, there is no indication that Kobran interviewed defendant with the purpose of aiding in his criminal prosecution or, as Justice Pollock suggests in his dissent, that she had a "hidden agenda" to obtain an "incriminating statement" from P.Z. Infra at 922-923, 703 A.2d at 128-129 (Pollock, J., dissenting). The decision to interview defendant had been made at a DYFS case planning conference after the meeting participants, including Kobran, her superiors, and lawyers from the civil division in the Attorney General's Office, discussed the information obtained from defendant's wife. In that a referral had been made to the Prosecutor's Office, there was certainly a possibility that a criminal investigation had begun. However, the record contains no reference to regular interaction between the civil and criminal authorities, let alone "manipulation" by DYFS to obtain information specifically to help the criminal authorities.
To the contrary, Kobran's phone call to Investigator Lazzaro after the case planning conference suggests that she did not know what the Prosecutor's Office had done or was doing in P.Z.'s case because she did not know whether the proposed meeting with defendant would impede the prosecutor's investigation. Although the prosecutor anticipated being informed about the results of Kobran's visit to P.Z., the visit had a legitimate independent purpose and was not pretextual. The record persuasively demonstrates that Lazarro's comments to Kobran did not precipitate her visit to P.Z. or cause her to inform the prosecutor about P.Z.'s statement. The determination to interview P.Z. was made prior to her phone call to Lazarro and Kobran was obligated by statute to provide the results of her investigation to the prosecutor. If there was evidence that a DYFS worker met with defendant simply as a subterfuge to achieve law enforcement purposes, we might well reach a different result. There was no such evidence.
These circumstances do not demonstrate an egregious deprivation of defendant's rights requiring application of the doctrine of fundamental fairness to suppress defendant's statement to Kobran.

*121 VII
We find no constitutional or other basis on which to hold defendant's April 5, 1994 statement inadmissible. We also find no basis to require DYFS caseworkers to give Miranda warnings or afford a right to counsel during non-coercive, non-custodial interviews of parents subject to Title Nine investigations.
The judgment of the Appellate Division is reversed.
POLLOCK, J., dissenting.
Occasional disagreement on an appellate tribunal is inevitable. As regrettable as disagreement may be, the exposition of different views may serve the public interest. My perception of the facts and law lead me to a conclusion opposite from that of the majority. Consequently, I respectfully dissent.
From my perspective, the only issue on this appeal is whether the State may admit in a criminal prosecution defendant's uncounselled oral statement made to a Division of Youth and Family Services (DYFS) investigator after invoking his right to counsel. Critical to this determination are the facts that both the DYFS caseworker and the Prosecutor knew that defendant's wife had incriminated him and that defendant was represented by counsel. The Appellate Division affirmed the Law Division's holding that admission of the statement would be unfair. 285 N.J. Super. 219, 228, 666 A.2d 1000 (1995). I would affirm.
Under the facts of this case, I believe it would be fundamentally unfair to allow the Prosecutor to introduce defendant's uncounseled inculpatory statement to the DYFS caseworker. The State would remain free to prosecute defendant on other evidence. It should not, however, be permitted to introduce the words that it induced him to utter in an ostensible attempt to determine whether it would return custody of his child to him and his wife.
Having identified the specific issue presented by the appeal, it might help to identify other issues that the appeal does not present. Identification of those irrelevant issues reveals flaws in *122 the majority opinion. For example, not at issue is whether defendant was in custody when questioned by the DYFS caseworker, Cheryl Kobran, at defendant's home. Ante at 103-104, 703 A.2d at 910. Contrary to the majority opinion, the fact that defendant's interrogation was non-custodial, however, does not moot "the question whether Kobran was acting as a law enforcement officer." Ante at 103, 703 A.2d at 910. Also not at issue is whether an admission of abuse may aid in the rehabilitation of abusive parents or whether termination of custody is automatic if a parent invokes his or her privilege against self-incrimination. Ante at 107-108, 703 A.2d at 912. Rehabilitation of abusive parents may be of vital concern in a custody case; it should have no bearing on the determination of the admissibility of a defendant's statement in a criminal prosecution. Similarly not involved is the question whether "the Title Nine right to counsel adequately protects parents' fundamental interest in the care and custody of their children." Ante at 117, 703 A.2d at 917. As adequate as that protection may be, it is irrelevant to determining the admissibility of defendant's statement in his criminal prosecution. Also beside the point is the absence from the record of any "reference to regular interaction between the civil and criminal authorities, let alone `manipulation' by DYFS to obtain information specifically to help the criminal authorities." Ante at 120, 703 A.2d at 918. The rarity, if such is the case, of an untoward arrangement between the prosecution and DYFS does not justify the arrangement when it occurs.

I.
An act of suspected child abuse affects two State interests. First, acting through DYFS, the State is primarily interested in protecting the child. DYFS pursues that interest through an action under N.J.S.A. 9:6-1 to -8.73 ("Title 9" action). Second, law enforcement officials have an interest in prosecuting the abuser for offenses such as endangering the welfare of the child and child abuse.
*123 The statutory scheme contemplates cooperation between DYFS and prosecutors. Statutes and administrative regulations govern the relationship between DYFS caseworkers and State law enforcement officials. The purpose of the regulations is to establish a framework for "liaison and improved communication and cooperation between the Division's District Offices and the several Prosecutor's Offices in order to further the mutual goals of protecting the child and proper law enforcement." N.J.A.C. 10:129-1.1(a)(4).
Under its regulations DYFS must:
[R]efer to county prosecutors all cases that involve suspected criminal activity on the part of a child's parent, caretaker or any other person.... [I]t is anticipated that in most of the cases referred extensive police involvement will not be warranted and indeed that in many cases no police involvement will be required.
[N.J.A.C. 10:129-1.1(a).]
DYFS must maintain the confidentiality of all records or reports of child abuse, and they make disclosure only in specifically enumerated circumstances. See N.J.A.C. 10:129-2.1. For example, DYFS may release records and reports to "[a] police or other law enforcement agency investigating a report of child abuse or neglect." N.J.A.C. 10:129-2.1(b)(2).
Before filing a Title 9 action, DYFS may conduct an investigation and a preliminary conference with a suspected abuser. Reflecting sensitivity to potential conflicts arising from a Title 9 action and a criminal prosecution, the Legislature has specifically barred any statement that DYFS may obtain in a preliminary conference from admission into evidence in a resulting criminal prosecution. N.J.S.A. 9:6-8.36.
Consistent with the legislative mandate, Section 409.4 of the DYFS caseworker's field manual, II Field Operations Casework Policy and Procedures Manual, advises caseworkers "[i]n cases where the police are already involved," the Prosecutor may request that the caseworker "not attempt to interview an alleged perpetrator." The Manual explains, "Generally the reason for such requests is the necessity for law enforcement to proceed according to prescribed legal procedures for conducting a criminal *124 investigation which includes ... advising the alleged perpetrator of his rights." Section 409.5 entitled, "Interviewing the Perpetrator in a Custodial Setting" states that the reason for communicating with the County Prosecutor's Office "is to ensure that the interview will not interfere with a criminal investigation and/or violate the person's Fifth Amendment rights against self-incrimination...." Finally, Section 507.1 entitled "Advising Perpetrator of Case Findings" instructs DYFS caseworkers that "whenever a case has been referred to the county prosecutor's office, the Case Manager must check with the county prosecutor or his designee prior to advising the perpetrator of the case findings." The Manual explains:
The reason for this is similar to the reasons for delaying an interview with a perpetrator (IIC 409.4). That is, notification of the findings may impede the criminal investigation, may lead to destruction or suppression of evidence, and may prevent the county prosecutor's office from being able to prove a criminal charge.
Thus, both the Legislature and DYFS recognize the delicate balance among DYFS's protection of a child's best interests, the Prosecutor's interest in enforcing criminal laws prohibiting child abuse, and a parent's privilege against self-incrimination. This Court should be no less sensitive in recognizing that certain statements admissible in a Title 9 proceeding may not be admitted in a criminal prosecution.
Society's paramount concern for the safety of children vests DYFS with considerable latitude when investigating suspected acts of child abuse. A criminal prosecution, by comparison, implicates countervailing considerations, such as the right of a defendant to counsel and the exclusion from evidence of a coerced statement.
Properly pursued, cooperation between DYFS and law enforcement officers can further the best interests of children and assist in the enforcement of criminal law. As this case illustrates, however, cooperation can also lead to coercion. Under the majority opinion, DYFS investigators may obtain statements from parents ostensibly to decide whether to return their children to them, but actually to convict the parents of child abuse. Prosecuting *125 parents on the basis of such statements may freeze the flow of information that DYFS needs to protect the best interests of children.

II.
The majority holds that defendant's uncounselled statement is admissible in his criminal prosecution. Critical to the majority's reasoning is its conclusion that "[t]he circumstances surrounding defendant's April 5 interview fail to demonstrate the coercive atmosphere and restraint of freedom that comprises a custodial interrogation." Ante at 103, 703 A.2d at 910. In reaching that conclusion, the majority admits that if defendant was in custody at the time of the interview, the invocation of his right to counsel would preclude admission of his statement. Because it finds that defendant was not in custody, the majority concludes that he was not coerced. For me, that conclusion views the facts of this case too antiseptically.
The essential facts are that in the fall of 1993, defendant's four- or five-month old daughter, C.Z., was hospitalized with injuries consistent with "Shaken Baby Syndrome." Acting on behalf of DYFS, the Attorney General instituted a Title 9 action. Public defenders represented defendant and his wife. N.J.S.A. 9:6-8.43(a). On DYFS's motion, the Family Part entered an order granting DYFS legal custody of the couple's two minor children, C.Z. and M.Z.C.Z. remained in the hospital. The court awarded defendant's father physical custody of M.Z. and prohibited defendant and his wife from unsupervised contact with her. The court also ordered defendant to undergo drug and psychological testing. Finally, the court directed defendant and his wife to participate in counseling and parent training.
Initially, both parents denied any responsibility for C.Z.'s injuries. Then, defendant's wife told Cheryl Kobran, a DYFS caseworker, that defendant had admitted to her that he was responsible for the injuries. Faced with the imminence of C.Z.'s release from the hospital, DYFS called a conference attended by Kobran, *126 her supervisor, the District Office Manager, a Case office Worker, a Litigation Specialist (a liaison between DYFS and the Attorney General), and a Deputy Attorney General. At that conference, Kobran was directed to interview defendant to ascertain if defendant would confirm his wife's version of the facts.
Kobran's supervisor and the Deputy Attorney General instructed Kobran "to call the Prosecutor's Office, to advise them of [Kobran's] intent to interview [defendant], in an effort not to impede any investigation that they may have had going on." Consequently, Kobran spoke with Investigator Lazarro of the Prosecutor's Office. According to Kobran, Lazarro told her that "[b]ecause [defendant] has a lawyer, [the Prosecutors] cannot interview him, but said that there is no obstacle to [DYFS] interviewing him, and asked that I call [the Prosecutor's Office] with my findings."
Without communicating with defendant's attorney, Kobran and another caseworker made an unannounced visit to defendant's home. After defendant's father admitted them to the home, Kobran asked him to leave the room and then, with the other investigator, confronted defendant alone.
Defendant thought that the purpose of the meeting was to discuss whether he and his wife would regain custody of their children. Still, he told Kobran that his counsel had advised him not to speak to her. If the State intended to introduce evidence of any statement made by defendant, Kobran should have stopped the interview until after defendant had spoken with his counsel.
Pursuant to the Prosecutor's authorization, however, Kobran "encouraged him to speak with me, because I said that we were there to finish the Division's investigation regarding the matter of [C.Z.'s] injuries. And also, we really needed to deal with the crisis at hand, which was where [C.Z.] was going to be going, because she was ready for discharge from the hospital. And also, [M.Z.]. As a result of this information, we had concerns about [M.Z.'s] protection."
*127 Defendant knew of DYFS's preliminary plan to put C.Z. in a foster home on her release from the hospital. Finally, Kobran told defendant that if he cooperated with DYFS, he might be able to resolve the "crisis." Significantly, Kobran did not inform defendant that any statement he made could be used against him in a criminal prosecution or that one reason for her visit was to induce him to confirm his wife's version of the facts.
After remaining quiet for some time, defendant began to talk. He was upset and remorseful. As Kobran testified, defendant said that C.Z. had cried, that he could not console her, and that he shook her two or three times out of frustration. In suppressing defendant's statement, the trial court accepted defendant's testimony that he had made the statement because it meant "my kids were going to come home, or so I thought anyway."
As the trial court found, defendant had "no reason to think, at least at this point, that he's going to be charged with anything, but we know that the Prosecutor has been involved, at that point, a good long period of time. They are looking at this case. And certainly, there's a possibility here that he's a target." Later, the trial court explained, "No Criminal Complaint's really filed, but [the Prosecutor is] there."
The issue before the Court is not whether DYFS may use defendant's statement to resolve the issue of custody of C.Z., but whether the Prosecutor may introduce the statement in its prosecution for child abuse. In resolving this issue, I accept the majority's characterization that defendant was not in "custody" in the constitutional sense. Ante at 104, 703 A.2d at 910. That characterization, however, does not predetermine that Kobran's interrogation was free from coercion or that admissibility of defendant's statement would not be fundamentally unfair.
The announced purpose of Kobran's visit was to determine whether the State would return custody of C.Z. to defendant and his wife. For most parents, the fear of losing custody of a child would produce a coercive effect. According to Kobran, that is precisely the effect it produced on defendant.
*128 When Kobran confronted defendant, moreover, she knew that defendant's wife had told DYFS that defendant had caused C.Z.'s injuries. The admissibility of the wife's statement is not before us, but the record indicates that the State could subpoena the wife to testify at defendant's prosecution. The Rules of Evidence specifically provide that "[T]he spouse of the accused in a criminal action shall not testify in such action except to prove the fact of marriage unless ... (b) the accused is charged with an offense against the spouse, a child of the accused or of the spouse, or a child to whom the accused or the spouse stands in the place of a parent." N.J.S.A. 2A:84A-17(2)(b); N.J.R.E. 501(2)(b).
Although the State contends that the purpose of the DYFS interview was to discover the cause of C.Z.'s injuries, the record supports the conclusion that another purpose was to elicit an incriminating statement from defendant. At least that is how the Prosecutor's Office perceived the purpose of the interview.
Unknown to defendant at the time he spoke with Kobran, she was acting both for DYFS and for the County Prosecutor. Even assuming, as the majority contends, that the DYFS caseworker was acting primarily to protect the best interest of C.Z., it remains that the caseworker also was acting on behalf of the County Prosecutor. In sum, Kobran was a dual agent. For the purpose of resolving whether defendant's statement is admissible in the criminal prosecution of defendant, Kobran's more relevant role is as the agent of the Prosecutor. Only after Kobran elicited the challenged statement from defendant did she reveal her hidden agenda.
The prior conference between Lazarro and Kobran, in which Lazarro requested Kobran to report any statement made by defendant, is sufficient to constitute Kobran as the Prosecutor's agent for the purpose of deciding whether to suppress the defendant's statement in his criminal prosecution. Under the circumstances, the Court should scrutinize Kobran's conduct as tantamount to that of a law enforcement officer. See State v. Helewa, 223 N.J. Super. 40, 50, 537 A.2d 1328 (App.Div. 1988).
*129 The majority takes a different view of the facts. It asserts that "there is no indication that Kobran interviewed defendant with the purpose of aiding in his criminal prosecution...." Ante at 120, 703 A.2d at 918. The majority stresses that the "Division's objective is to protect children from abuse and neglect and not to promote law enforcement" and that "Kobran's discussion with the Prosecutor's Office prior to her visit to P.Z. was intended solely to find out whether the visit would impede any investigation by that office, and not to further the prosecutor's investigation." Ante at 116, 703 A.2d at 916. Yet, the majority refuses to suppress defendant's statement because of its perception that suppression would force DYFS caseworkers "to choose between providing Miranda warnings and foreclosing the use in criminal proceedings of information obtained in the course of an ... investigation...." Ante at 112-113, 703 A.2d at 914. If, as the majority contends, a DYFS caseworker should be unconcerned with promoting prosecutions, the caseworker should be equally unconcerned with the admissibility of a parent's statement in a criminal prosecution. By emphasizing that Kobran was concerned not only with the child's best interests but with the admissibility of defendant's statement in the criminal prosecution, the majority implicitly confirms Kobran's status as a dual agent.
The proof of the pudding is in the eating. Here, the proof is that the Prosecutor, having authorized Kobran to take a statement from defendant, now wants to introduce that statement in the prosecution of defendant.
To justify admission of defendant's statement, the majority relies on a decision of the Minnesota Supreme Court involving application in a custody case of a parent's Fifth Amendment privilege against self-incrimination. In In re J.W., 415 N.W.2d 879 (Minn. 1987), the Minnesota Supreme Court held that the Fifth Amendment protected parents from a court order compelling them to incriminate themselves as a condition precedent to obtaining custody of their children. Id. at 883. The Court found that "[a]ssertion of a constitutional right does not make a person a less *130 fit parent, any more than it makes a person a less good citizen." Ibid. Recognizing, however, that the parents' failure to admit their fault may hinder the usefulness of therapy, the Court concluded that the failure could "hurt the parents' chances of regaining their children." Ibid. Under the Fifth Amendment, the State may well be able to consider a parent's failure to explain their child's injuries when considering custody. J.W.'s conclusion, however, is irrelevant to determining whether it is fundamentally unfair to permit the Prosecutor to introduce in evidence a statement, which would be inadmissible if obtained by the Prosecutor.
Demonstrating concern for the delicate balance between protecting the best interests of children and prosecuting culpable parents, the Minnesota Court observed further:
If the state believes talking to the psychologist about the nephew's death would help [the parents] become good parents, the state could abandon its pursuit of criminal prosecutions and apply to the court for a grant of immunity for the parents. The parents could then, without fear of prosecution or prison, participate in meaningful therapy.
[Id. at 884.]
Thus, the Minnesota Court recognized that the State might better serve the public interest by forsaking admission of parental statements in a criminal proceeding for frank disclosure in a custody action. To this extent, J.W. supports the exclusion, rather than the admission of defendant's statement.
In the present case, if defendant had made his statement at a preliminary conference or while he was in custody, his statement would be inadmissable at his criminal trial. Because defendant did not make his statement in a preliminary conference, the prohibition of N.J.S.A. 9:6-8.36 does not apply. Moreover, in the sense that Kobran's interrogation took place in defendant's home, and not the Prosecutor's office or DYFS's office, defendant was not in "custody" as the DYFS manual defines that term. Strictly speaking, therefore, Section 409.5 of the DYFS manual does not apply. The purpose of both the statute and the manual, however, is to prevent the State's exploitation of the parent-child relationship *131 by coercing a parent to make a statement not to determine the child's best interests, but to convict the parent of child abuse.

III.
In an analogous case, this Court declared inadmissible in the prosecution of a woman for fornication written statements she had made when seeking welfare for her illegitimate children. State v. Clark, 58 N.J. 72, 275 A.2d 137 (1971). When she applied for welfare, the local welfare department instructed her to file a bastardy complaint against the children's father. Id. at 77, 275 A.2d 137. In the complaint, the woman made incriminating statements admitting that she and the father had engaged in sexual relations. Id. at 79, 275 A.2d 137. Like defendant in this case, the woman was not in custody when she made the statements. Similarly, the governmental agency failed to advise the woman of her privilege against self-incrimination. Id. at 79-80, 275 A.2d 137. The State, however, introduced her testimony in evidence when prosecuting her and the father for fornication. Id. at 82, 275 A.2d 137. This Court reversed the conviction, finding the uncounseled statements inadmissible because of "Fifth Amendment implications involved, in association with strong considerations of public policy." Id. at 83, 275 A.2d 137. Notwithstanding the Court's reference to the "Fifth Amendment," the opinion is best understood as a finding that admission of the defendant's uncounseled statements was fundamentally unfair.
The doctrine of fundamental fairness protects against unjust or oppressive governmental action. Doe v. Poritz, 142 N.J. 1, 107-08, 662 A.2d 367 (1995). It "serves, depending on the context, as an augmentation of existing constitutional protections or as an independent source of protection against state action." State v. Ramseur, 106 N.J. 123, 377, 524 A.2d 188 (1987) (Handler, J., dissenting). The doctrine applies "where not to do so will subject the defendant to oppression, harassment, or egregious deprivation." State v. Yoskowitz, 116 N.J. 679, 712, 563 A.2d 1 (1989) (Garibaldi, J., concurring and dissenting). Essentially, the doctrine *132 of fundamental fairness operates throughout the criminal justice process to assure procedural fairness in the absence of constitutional or statutory protection. Poritz, supra, 142 N.J. at 108-09, 662 A.2d 367. When a civil action and a criminal prosecution interrelate, courts must be particularly "sensitive to the potential for the State's deliberately manipulating a civil procedure in order to obtain evidence against a criminal defendant." State v. Kobrin Securities, Inc., 111 N.J. 307, 317, 544 A.2d 833 (1988). I respectfully submit that it is fundamentally unfair for the State to admit into evidence in this criminal prosecution defendant's uncounseled oral statement to the DYFS caseworker who represented that she was trying to determine whether DYFS would return custody of defendant's child to him and his wife. Consequently, I dissent.
Justice COLEMAN joins in this opinion.
COLEMAN, J., dissenting.
I concur in Justice Pollock's dissenting opinion. I write separately because I believe defendant's confession should be inadmissible in the criminal proceedings for an additional reason.
This case involves the admissibility of a confession that resulted from a noncustodial interrogation during an ostensible Title Nine civil investigation. The trial court excluded the confession under a Sixth Amendment analysis based on defendant invoking the right to counsel. The Appellate Division excluded the confession based on the twin principles of fundamental fairness and the public policy of furthering the Title Nine "objective of child protection by promoting disclosures and admissions of abuse at the earliest possible time." State v. P.Z., supra, 285 N.J. Super. at 229, 666 A.2d 1000. It also used a Fifth Amendment waiver analysis and a Sixth Amendment right to counsel approach in concluding that "statements to DYFS during the pendency of the Title Nine investigation may not be used against a party in a criminal action" unless Miranda has been followed. Ibid. I believe that defendant's confession should be suppressed for want of voluntariness *133 in the Fourteenth Amendment confession context rather than simply in a Fifth Amendment Miranda waiver context.
The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. That amendment "secures against state invasion ... the right of a person to remain silent unless he [or she] chooses to speak in the unfettered exercise of his [or her] own will." Malloy v. Hogan, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653, 659 (1964).
Under the Due Process Clause, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." Miller v. Fenton, 474 U.S. 104, 109, 106 S.Ct. 445, 449, 88 L.Ed.2d 405, 410 (1985). An interrogation technique becomes offensively intolerable when "self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037, 1058 (1961). Consequently, the test for involuntariness in the Due Process Clause context focuses on both police or governmental overreaching and the suspect's free will. Under our accusatorial system of justice, in contrast to an inquisitorial system, a coerced confession is inadmissible because its involuntariness makes it unreliable. Jackson v. Denno, 378 U.S. 368, 382-86, 84 S.Ct. 1774, 1783-86, 12 L.Ed.2d 908, 919-21 (1964); State v. Jordan, 147 N.J. 409, 425-28, 688 A.2d 97 (1997); State v. Hampton, 61 N.J. 250, 264-65, 294 A.2d 23 (1972).
Since the formation of our constitutional form of government, the right of a parent to raise and educate his or her children has been regarded as a fundamental right. Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599, 606 (1982); Roe v. Wade, 410 U.S. 113, 152-53, 93 S.Ct. 705, 726-27, 35 L.Ed.2d 147, 176-77 (1973); Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212-13, 31 L.Ed.2d 551, 558-59 (1972); Pierce v. *134 Society of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 573, 69 L.Ed. 1070, 1077-78 (1925); In re Promulgation of Guardianship Servs. Regulations, 103 N.J. 619, 634, 512 A.2d 453 (1986); In re Guardianship of Dotson, 72 N.J. 112, 122, 367 A.2d 1160 (1976) (Pashman, J., concurring). That interest is "`implicit in the concept of ordered liberty.'" Paul v. Davis, 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405, 421 (1976) (quoting Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 151-52, 82 L.Ed. 288, 292 (1937)). A state's interference with those fundamental rights may be justified only by the most important of state interests, and even then, the State must use the narrowest means which can be designed to achieve the public purpose, here, the protection of abused or neglected children. Under the majority's opinion, that has not occurred in this case.
Whenever a liberty interest is at stake, due process must be followed before interfering with that interest. The question then becomes what due process is required. It has been described as an elusive concept whose "exact boundaries are undefinable." Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307, 1321 (1960). It is both a flexible and "dynamic concept," Callen v. Sherman's, Inc., 92 N.J. 114, 134, 455 A.2d 1102 (1983), whose "sense of fairness cannot be imprisoned in a crystal." Id. at 136, 455 A.2d 1102.
Defendant relies on two out-of-state cases to support his contention that his confession was coerced based on the interrogator's not-so-subtle suggestion that if he did not cooperate, his fundamental right to his children would be jeopardized. This argument is persuasive. In Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), a confession was found to have been coerced because the interrogator told a mother that state financial aid for her children would be terminated, that her children could be taken from her, and that she would receive a long prison term unless she admitted to selling marijuana to an informant. Id. at 531-34, 83 S.Ct. at 919-20, 9 L.Ed.2d at 925-26.
*135 In United States v. Tingle, 658 F.2d 1332 (9th Cir.1981), a mother of a two-year-old child confessed to participating in a robbery after her interrogator threatened that she would not see her child for a long time if she did not cooperate and warned her of the long term of imprisonment which could be imposed. The court held:
We think it clear that the purpose and objective of the interrogation was to cause Tingle to fear that, if she failed to cooperate, she would not see her young child for a long time. We think it equally clear that such would be the conclusion which Tingle could reasonably be expected to draw from the agent's use of this technique. The relationship between parent and child embodies a primordial and fundamental value of our society. When law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit "cooperation," they exert the "improper influence" proscribed by Malloy.

[Id. at 1336.]
Both Lynumn and Tingle involved noncustodial interrogations in criminal cases. Both confessions were suppressed under the Due Process Clause. The same rule prevails when interrogations occur in civil cases regardless of whether criminal charges are likely to follow. See, e.g., Mathis v. United States, 391 U.S. 1, 4, 88 S.Ct. 1503, 1504-05, 20 L.Ed.2d 381, 384 (1968) (involving questions asked by Internal Revenue Service agent during routine tax investigation); United States v. Mata-Abundiz, 717 F.2d 1277, 1279 (9th Cir.1983) (involving questions asked during Immigration and Naturalization Service investigation); State v. Clark, 58 N.J. 72, 83, 275 A.2d 137 (1971) (involving welfare, bastardy and police proceedings).
A party to Title Nine litigation is permitted to speak with another party involved in that litigation who is known to be represented by counsel. However, a prosecutor may not use a DYFS worker as an agent to circumvent the rules of professional responsibility that forbid the prosecutor from directly speaking to such a party. See ABA Comm. on Ethics and Professional Responsibility, Formal Op. 95-396 (1995) (holding a lawyer may not direct an investigative agent to communicate with a represented person in circumstances where the lawyer would be prohibited *136 from doing so). Because defendant's wife had informed DYFS that he had admitted to shaking the child, the interrogation of defendant in isolation and without his attorney was designed to obtain evidence for the prosecution independent of DYFS's needs necessitated by the Title Nine proceedings. Thus, when Kobran interrogated defendant, her "role changed and became essentially like that of an agent of the State." Estelle v. Smith, 451 U.S. 454, 467, 101 S.Ct. 1866, 1875, 68 L.Ed.2d 359, 372 (1981); State v. Helewa, 223 N.J. Super. 40, 47, 537 A.2d 1328 (App.Div. 1988).
Significantly, while acting like an agent of the prosecutor, Kobran told defendant essentially that unless he cooperated, he would lose his fundamental right to the custody and the rearing of his children. The absence of legal counsel and Kobran's request that defendant's father leave them alone, contributed to the coercive nature of the interrogation. See Blackburn v. Alabama, 361 U.S. 199, 207-08, 80 S.Ct. 274, 280-81, 4 L.Ed.2d 242, 249 (1960) (holding that the absence of legal counsel, friends and family members are factors bearing on whether there was coercion).
"The aim of the requirement of due process is ... to prevent fundamental unfairness in the use of evidence whether [that evidence is] true or false." Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166, 180 (1941). Here, the degree of unfairness was enhanced by the fact that although Kobran knew defendant had counsel in the Title Nine action, which was constitutionally mandated because the stakes were so high, New Jersey Div. of Youth and Family Servs. v. E.B., 137 N.J. 180, 186, 644 A.2d 1093 (1994), she nonetheless, while acting as an agent of the prosecutor, ignored his expressed desire to have counsel present during her interrogation.
Governmental activities that are coercive may preclude a confession from being used as evidence when it was involuntarily obtained within the meaning of the Due Process Clause of the Fourteenth Amendment. Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484 (1986). Under the totality of the circumstances, I am persuaded that defendant's confession *137 was coerced. When a confession is coerced, it should be excluded from the State's case-in-chief because it is deemed to be involuntary and therefore unreliable. Consequently, I would modify the judgment of the Appellate Division and affirm the suppression of the confession.
For reversal  Chief Justice PORITZ, and Justices HANDLER, O'HERN, GARIBALDI and STEIN  5.
For affirmance  Justices POLLOCK and COLEMAN  2.
NOTES
[1] "Title Nine" is used generally herein to describe investigatory and other activities carried out by the Division pursuant to its duties to safeguard children under N.J.S.A. 9:6-1 to -8.73.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] Organized under the Department of Human Services, DYFS is the comprehensive social services State agency charged with the "care, custody, [and] guardianship" of children. N.J.S.A. 30:4C-4; see also N.J.S.A. 30:1-9, -12; N.J.S.A. 30:4C-26a. The Division investigates abuse and neglect complaints involving children and provides a wide range of programs and services to protect children in need, N.J.A.C. 10:120-1.1b, including: "protective services for abused and neglected children, foster and group home placements, residential placements, child care, adoption services, counseling, advocacy and case management, adult protective services and personal attendant services." N.J.A.C. 10:120-1.2c.
[4] N.J.S.A. 9:6-3 provides that it is a crime of the fourth degree for a person having custody or control of a child to "abuse, abandon, be cruel to or neglectful of such child." Persons accused of abuse and neglect of a serious nature are prosecuted under the New Jersey Criminal Code (e.g., offenses of the first, second, third and fourth degrees, including assault, N.J.S.A. 2C:12-1, sexual assault, N.J.S.A. 2C:14-2, and endangering the welfare of a child, N.J.S.A. 2C:24-4).
[5] On July 30, 1997, the Comprehensive Child Abuse Prevention and Treatment Act, which relaxes the confidentiality restrictions to which DYFS is subject, was enacted. L. 1997, c. 175. The Act not only allows disclosure of DYFS records in certain instances to the legal counsel of a child, parent or guardian, or to the parent or guardian himself or herself, but also allows disclosure to the public of "the findings or information about a case of child abuse or neglect which has resulted in a child fatality or near fatality." Id. § 16.
[6] We observe that Kobran's interview with defendant does not constitute a violation of RPC 4.2, which prohibits a lawyer from communicating with a represented party about the subject matter of the representation without the consent of that party's lawyer. The rule is directed at lawyers not at parties. Model Rules of Professional Conduct Rule 4.2 cmt. (1992) (noting that "parties to a matter may communicate directly with each other" without violating the rule).
[7] In contrast, the court in Flower, supra, found that the only purpose motivating a DYFS investigator when she interrogated the defendant in prison was to assist in the defendant's prosecution. 224 N.J. Super. at 218, 539 A.2d 1284. In those circumstances, the court properly held that Miranda warnings were required.
[8] We express no opinion, however, about how the recently enacted Comprehensive Child Abuse Prevention and Treatment Act will affect this analysis. L. 1997, c. 175; see supra note 5. Under the Act, DYFS is "not ... required to provide diligent efforts to reunify the child with a parent" in cases where a parent has been convicted of killing or attempting to kill, or assaulting or attempting to assault, one of his or her children. L. 1997, c. 175, § 5. Section 17 of the Act allows a petition to terminate the parental rights of a parent convicted of one of the enumerated crimes to be filed pursuant to N.J.S.A. 30:4C-15. L. 1997, c. 175, § 17. To the extent that the purpose of DYFS investigations undertaken pursuant to this Act are altered, the totality of the circumstances analysis may be affected.