**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1355-21

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

CINDY KEOGH and
DAVID KEOGH,

    Defendants-Respondents,

and

RYAN D. KEOGH,

    Defendant.

_____

Submitted May 23, 2022 – Decided June 28, 2022

Before Judges Messano, Accurso and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Indictment No. 19-05-0288.

Annmarie Taggart, Acting Somerset County Prosecutor, attorney for appellant (Paul H. Heinzel,

Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

Brynn Giannullo, attorney for respondent Cindy Keogh.

Mazraani & Liguori, LLP, attorneys for respondent David Keogh (Jeffrey S. Farmer, on the brief).

PER CURIAM

This is the second time we have granted the State of New Jersey leave to appeal from an interlocutory order entered by the Law Division in this prosecution surrounding the January 9, 2019 shooting death of Terrence Coulanges. In our prior decision, we reversed the court's order denying the State's motion to sever the murder charge against defendant Ryan Keogh, from the charges brought against his parents, defendants Cindy and David Keogh. State v. Keogh, No. A-1623-20 (App. Div. July 22, 2021) (slip op. at 2). The charges against Cindy and David[1] — hindering apprehension, endangering an injured victim, and multiple counts of false swearing — are premised on their alleged conduct and statements they made to law enforcement following the

---

[1] Because all defendants share the same last name, we refer to them by their first name throughout this opinion to avoid confusion. We intend no disrespect by this informality.

shooting at the family's Bound Brook residence. We detailed the State's contentions in our prior opinion and need not repeat them here. Id. at 3–15.

Contemporaneous with our consideration of the State's prior appeal, the Law Division judge conducted evidentiary hearings pursuant to N.J.R.E. 104(c) on the State's motion to admit defendants' recorded statements to law enforcement officers made on the evening of the shooting. The judge concluded the State could introduce Ryan's statements, but he suppressed statements made by Cindy and David, reasoning they "were made during a custodial interrogation without Miranda[2] warnings having been issued." We granted the State leave to appeal from the judge's August 20, 2021 order suppressing Cindy's and David's statements, and the judge's November 30, 2021 order denying the State's motion for reconsideration.

I.

We summarize the evidence adduced by the State at the multi-day N.J.R.E. 104(c) hearing, particularly as it pertains to the statements made by Cindy and David.

At approximately 7:36 p.m., Officer Philip Gatti of the Bound Brook Police Department was dispatched to the Keoghs' home on a report of "shots

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

fired" at an intruder on the property with one person injured. Arriving in minutes, he saw Cindy, who had called 9-1-1, standing at the edge of the driveway. Cindy said a family friend who had lived with the Keoghs at a point in the past was shot outside the carriage house behind the main residence. Cindy said her husband and son were still inside the home. Gatti ordered Cindy to call David and Ryan out of the house so police could investigate and secure the scene. Cindy made the call on her cell phone; David and Ryan emerged and were directed to keep their hands raised in the air as they walked to the end of the driveway, where police patted down both men.

South Bound Brook Officer Jason Kreideweis testified as the men walked to the end of the driveway, Ryan stated, without being questioned, "there was possibly someone still shot in the backyard on the porch and may still be in possession [of] a handgun." The statement prompted several officers to draw their weapons as they proceeded to the rear of the main house. Gatti soon learned Ryan had shot Coulanges. Officers approached the carriage house and saw Coulanges lying on the porch. They secured the handgun that was nearby and placed handcuffs on Coulanges, who was non-responsive to their resuscitation efforts.

Middlesex Police Officer Scott Mulford arrived at the Keogh home at 7:42 p.m. and was "told to stand by with [Ryan and his parents]." Mulford said "at no point did [he] think [he] had to supervise them." Bound Brook Police Lieutenant Richard Colombaroni, the ranking officer at the scene, explained things were "still very much evolving" as he arrived, "[s]o [he] just asked that an officer stand by with [the Keoghs]. Especially, at that point believing that someone had tried to enter their home. Make sure they are okay. Make sure they are safe and secure." Colombaroni said only Coulanges was "in custody."

Mulford engaged in small talk with the Keoghs, but "when [he] realized what was going on at the scene," he asked them to please refrain from talking among themselves. Although testifying he never ordered the Keoghs not to "speak to each other," Mulford's report stated, "It should be noted that I had to advise all parties to remain silent and not to converse with each other multiple times." Mulford said Cindy asked "once or twice if she could go in the house [to] get a coat," but he told her she could not enter the house because it was an active crime scene. Mulford said no one otherwise asked to leave the driveway.

The authorities promptly applied for search warrants for the main house, the carriage house, and three vehicles on the premises used by defendants. Police transported the Keoghs to headquarters in separate police vehicles to be

interviewed and provide statements, since the interviews could not be conducted in the residence, and defendants were not permitted to use their cars. All defendants arrived at the station within minutes of leaving the Keoghs' home. Kreideweis testified Cindy "actually [gave him] directions . . . to get out of the section of town that [defendants] live[d] in and back to Bound Brook Police Department."

Detective Randy Sidorski of the Somerset County Prosecutor's Office Major Crimes Unit interviewed each defendant in the company of other detectives. Defendants were separated from each other before Sidorski arrived, with Cindy in the lobby, Ryan in an interview room, and David in a secondary interview room. Sidorski testified that separation of witnesses is "commonplace in any investigation . . . [because i]t maintains the integrity of the investigation." Sidorski knew Coulanges was fatally shot, and he had "no reason to doubt . . . at that point" all preliminary accounts indicating Ryan shot Coulanges in self-defense.

Sidorski first recorded Cindy's statement after escorting her from the lobby to the interview room and moving David to the lobby. Sidorski explained, "Typically, in any investigation [police] would start with the 9-1-1 caller in terms of interview" sequence. Sidorski testified Cindy agreed to answer his

questions, was cooperative, coherent, and had no trouble communicating. Cindy's interview lasted approximately twenty-five minutes, and thereafter, another detective ushered Cindy back to the lobby and brought David in for his interview.

Sidorski testified he wanted to speak to David to "ascertain his involvement, especially after Cindy said [during her interview] that she called David at some point." Sidorski regarded David as "[a] witness" and did not know if he was at the residence during the shooting. Sidorski said David agreed to answer all his questions, and the interview was "[c]onversational." David's interview began at 9:46 p.m. and ended eighteen minutes later at 10:04 p.m.

Ryan was separately interviewed last after he was given <u>Miranda</u> warnings. The judge concluded Ryan "made [his] statements knowingly, intelligently and voluntarily and there was no police coercion . . . during the interview. . . . The statements made by Ryan are plainly admissible."

After Cindy and David provided their statements, Colombaroni met them in the lobby, which he described as a space in the municipal building that the Police Department "cohabitated" with other departments. The lobby was open to the public during business hours but secured after hours with access limited

by the police dispatcher who could "buzz" people in and out. Cindy and David were unrestrained, sitting outside the dispatcher's window.

Someone told Colombaroni "the Keoghs were inquiring of the status of what was occurring with Ryan[,] and they were concerned." Colombaroni spoke with them in the lobby. Cindy and David "asked what was going on with Ryan," and Colombaroni said he "knew nothing further at th[at] point other than the investigation was active." Because their interviews were over, Colombaroni told Cindy and David "if they would like to leave, they were free to leave." They wished to stay, however, pending further information about their son.

Police were executing the search warrants for the Keogh property before Ryan's interview was completed at approximately 2:00 a.m. Colombaroni escorted all three defendants back to their home to collect some things, but since the scene was still being processed, defendants were unable to remain in their home.

After further investigation, which we detailed in our prior opinion, see Keough, slip op. at 4–8, 13–15, and more than one month later, on February 13, 2019, Ryan was charged with Coulanges' murder. Cindy and David were both charged the following day. Defendants did not call any witnesses nor testify at the hearing.

A-1355-21

In the written decision that accompanied his August 20, 2021 order suppressing Cindy's and David's statements, the judge determined they "were in custody for the purposes of <u>Miranda</u>." The judge found the couple "never left the line of sight of the officers and were subject to numerous commands . . . that left them no other option but to comply with these commands." The judge further found defendants were driven to police headquarters, were unable to "drive their own vehicles or report to the police station at another time." He noted although "the Keoghs were free to leave after they gave their statements[,] . . . they were still subject to further police supervision because the police were executing a search warrant on their residence[,] and they could not enter their home." The judge rejected the State's contention that <u>Miranda</u> warnings were not required because Cindy and David were "treated as witnesses and not suspects," observing, "that is not the test. The test is whether a reasonable person, in the defendant's position, would feel free to leave."

Additionally, the judge found Cindy and David "were subject to a custodial interrogation for <u>Miranda</u> purposes." The judge said, "The test [wa]s whether the police used actions or words that the police should have known were reasonably likely to elicit an incriminating response from the suspect." He concluded "the police should have known that questioning an individual about

9

a dead body that was found on their property with none of the residents injured[] could likely elicit an incriminating response."

In denying the State's motion for reconsideration, the judge's written opinion accompanying the order said he "remain[ed] convinced that Cindy and David were in custody because the totality of the circumstances show that a reasonable person in their position would not feel free to leave. . . . The police conduct in this case was equivalent to a formal arrest." Regarding whether Cindy's and David's statements were the product of "custodial interrogation," the judge reasoned, "Since the police asked questions about the crime and knew that at least one of the Keoghs was involved, they should have [M]irandized Cindy . . . and David." He found that questioning Cindy and David in their driveway and at the police station, i.e., "at different locations," increased the investigators' "expectation of receiving an incriminating response."

## II.

Before us, the State reiterates the arguments it made before the Law Division judge. It contends Cindy and David were neither in custody nor interrogated and, therefore, Miranda did not apply. Additionally, the State argues that Miranda cannot be applied "to suppress new crimes committed during police interviews." Defendants counter by arguing the judge properly

assessed the facts, which were largely undisputed, and correctly applied <u>Miranda</u> to suppress the statements investigators secured without providing the requisite warnings.

We agree with the State that Cindy and David were not subjected to custodial interrogation. We therefore reverse.

"[O]ur review requires that we 'defer to the factual findings of the trial court . . . supported by sufficient evidence in the record,' because a trial court's decision is influenced by the opportunity to hear and see the witnesses." <u>State v. Gonzalez</u>, 249 N.J. 612, 628 (2022) (quoting <u>State v. Hubbard</u>, 222 N.J. 249, 262 (2015)). "When, as here, we consider a ruling that applies legal principles to the factual findings of the trial court, we defer to those findings but review de novo the application of those principles to the factual findings." <u>State v. Hinton</u>, 216 N.J. 211, 228 (2013) (citing <u>State v. Harris</u>, 181 N.J. 391, 416 (2004)); <u>see also</u> <u>State v. A.M.</u>, 237 N.J. 384, 396 (2019) ("An appellate court owes no deference, however, to 'conclusions of law made by lower courts in suppression decisions.'" (quoting <u>State v. Boone</u>, 232 N.J. 417, 426 (2017))).

It is axiomatic that "the protections provided by <u>Miranda</u> are only invoked when a person is both in custody and subjected to police interrogation." <u>Hubbard</u>, 222 N.J. at 266 (citing <u>State v. P.Z.</u>, 152 N.J. 86, 102 (1997)).

"Essentially, 'Miranda turns on the potentially inquisitorial nature of police questioning and the inherent psychological pressure on a suspect in custody.'" Ibid. (quoting P.Z., 152 N.J. at 102).

The determination of whether a person is in custody is "fact-sensitive," requiring a "'case-by-case approach, in which the totality of the circumstances must be examined.'" State v. O'Neal, 190 N.J. 601, 622 (2007) (quoting State v. Godfrey, 131 N.J. Super. 168, 175–77 (App. Div. 1974)); see also State v. Stott, 171 N.J. 343, 364 (2002) ("Whether a suspect has been placed in custody is fact-sensitive and sometimes not easily discernible."). "[C]ustody in the Miranda sense does not necessitate a formal arrest, nor does it require physical restraint in a police station, nor the application of handcuffs, and may occur in a suspect's home or a public place other than a police station." Hubbard, 222 N.J. at 266 (alteration in original) (quoting P.Z., 152 N.J. at 103).

"The critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors." Id. at 266–67 (quoting P.Z., 152 N.J. at 103). However, "[i]f the questioning is simply part of an investigation and is not targeted at the individual because she or he is a

suspect, the rights provided by <u>Miranda</u> are not implicated." <u>Id.</u> at 266 (alteration in original) (emphasis added) (quoting <u>State v. Timmendequas</u>, 161 N.J. 515, 614–15 (1999)).

Here, in determining Cindy and David were in "custody," the judge gave unwarranted legal significance to the interaction between defendants and police at the scene of the homicide. It is well-recognized that "[t]he rights set forth in <u>Miranda</u> are not implicated 'when <u>the detention</u> and questioning <u>is part of an investigatory procedure</u> rather than a custodial interrogation.'" <u>State v. Smith</u>, 307 N.J. Super. 1, 9 (App. Div. 1997) (emphasis added) (quoting <u>State v. Pierson</u>, 223 N.J. Super. 62, 66 (App. Div. 1988)). The undisputed testimony at the hearing was that the situation at defendants' home was "dynamic," with police trying to discern exactly what happened and to ensure the Keoghs' safety. <u>See, e.g.</u>, <u>State v. Smith</u>, 374 N.J. Super. 425, 434–36 (App. Div. 2005) (holding "on-the-scene questioning" by officers responding to a domestic violence call was "not custodial interrogation" requiring <u>Miranda</u> warnings).

The judge gave similar undue weight to the fact that Cindy and David were separated for the drive to, and while at, police headquarters. In <u>State v. Purnell</u>, we rejected the defendant's claim of ineffective assistance of trial counsel for failing to move to suppress a statement the defendant made to police

shortly after the murder victim was found in the defendant's backyard. 310 N.J. Super. 407, 420–22 (App. Div. 1998), rev'd on other grnds, 161 N.J. 44 (1999). The "[d]efendant, his fiancée, and their children were taken to headquarters to give formal statements after defendant gave a preliminary and clearly voluntary oral statement to the investigating detectives at his home." Id. at 421–22. In concluding trial counsel was not ineffective for failing to file a meritless motion to suppress, we said: "The fact that [the defendant] and his fiancée were separated at headquarters, presumably so that they could not confer before giving their statements, did not mean that defendant was in custody. He was at headquarters only for a short period and then was permitted to leave." Id. at 422.

We note that here, Cindy and David were affirmatively told they were free to leave after providing their statements, but both chose to stay until Ryan had completed his statement. And, while such assurances by police that one is free to leave are not necessarily dispositive of whether an interrogee is in "custody," see, e.g., Godfrey, 131 N.J. Super. 175–76, that Cindy, David and Ryan all left the stationhouse that night is important when considering the totality of circumstances. See State v. McLaughlin, 310 N.J. Super. 242, 250 (App. Div. 1998) (concluding the defendant was not in custody by noting among other

factors his ability to leave after each day of interrogation by investigators and return to his motel room); see also Pierson, 223 N.J. Super. at 67 ("The determinative consideration is whether a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would or would not be free to leave." (citing United States v. Booth, 669 F.2d 1231, 1235 (9th Cir. 1981))). Investigators did not arrest Ryan, Cindy, and David until more than one month later and only after further investigation provided the necessary probable cause.

Lastly, by noting defendants were unable to return home because their cars and home were subject to the simultaneous execution of search warrants, the judge mistakenly "placed too much emphasis on circumstances that the officer[s] neither controlled or exploited." Smith, 374 N.J. Super. at 436. Police were investigating a homicide that occurred only hours earlier at the property, and it is obvious that possible tampering or contamination of evidence required security of the site and the vehicles. Considering all the attendant circumstances, Cindy and David were not in custody when they provided their statements to Sidorski.

Even if we are mistaken in this regard, the judge erred in determining the statements were the product of custodial "interrogation." "[M]ere investigative

questioning directed at an individual who is not a suspect does not implicate Miranda." Hubbard, 222 N.J. at 271 (citing Timmendequas, 161 N.J. at 614–15); see also P.Z., 152 N.J. at 102 ("Miranda turns on the potentially inquisitorial nature of police questioning and the inherent psychological pressure on a suspect in custody." (emphasis added) (citing Miranda, 384 U.S. at 445–58)). Video recordings of the actual statements made by Cindy and David show the interviews were clearly conversational, non-confrontational and investigative in nature. The judge did not find otherwise.

Instead, the judge seemingly focused on that branch of precedent dealing not with express questioning by police, but rather the "functional equivalent of interrogation." In re A.A., 240 N.J. 341, 352 (quoting Rhode Island v. Innis, 446 U.S. 291, 300–01 (1980)). In that regard, "interrogation [for purposes of Miranda] refers to 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" Id. at 353 (quoting Innis, 446 U.S. at 301). Here, the judge concluded "the police should have known that questioning an individual about a dead body that was found on their property with none of the residents injured, could likely elicit an incriminating response."

16

However, nothing in this record suggests the investigators anticipated their questioning was "reasonably likely to elicit" facts that could incriminate Cindy or David in the homicide police were investigating. In fact, the statements Cindy and David provided never did. The judge appears to have misapprehended the thrust of <u>Innis</u> and our Court's adoption of its principles.

In sum, we agree with the State that Cindy and David were not subjected to custodial interrogation, and it was legal error for the judge to suppress the statements obtained from them by investigators on the night of the homicide. Given his erroneous conclusion, the judge did not address whether the State demonstrated beyond a reasonable doubt the statements given by Cindy and David were voluntarily made and not the product of having their wills overborne. <u>See, e.g.</u>, <u>State v. L.H.</u>, 239 N.J. 22, 27 (2019) ("To ensure that law enforcement officers turn square corners, New Jersey's jurisprudence requires that the State 'prove the voluntariness of a [statement to law enforcement] beyond a reasonable doubt.'" (quoting <u>State v. Galloway</u>, 133 N.J. 631, 654 (1993))). We opt to exercise original jurisdiction pursuant to <u>Rule</u> 2:10-5 and conclude on the record presented, the State met its burden of proof.

As a result of our conclusions, we need not address the State's novel alternative argument that <u>Miranda</u> does not apply to "crimes committed during police interview."

Reversed and remanded to the trial court for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1355-21