**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2955-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MURAD S. LAMPLEY, a/k/a
MURAD I. LAMPLEY,
MURAD LAMPLEY,
SHAEED LAMPLEY, MURAD
SHAHEED LAMPLEY, and
RADIE,

    Defendant-Appellant.

_____

Argued March 24, 2026 – Decided April 21, 2026

Before Judges Sumners and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 18-08-2747.

Ethan J. Kisch, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Ethan J. Kisch, of counsel and on the brief).

Lucille M. Rosano, Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens, II, Essex County Prosecutor, attorney; Lucille M. Rosano, of counsel and on the brief.)

PER CURIAM

In August 2019, defendant Murad Lampley and two co-defendants were charged in an eleven-count Essex County indictment[1] with murder and related offenses for their part in the killing of Shuri Henry in Newark. Before trial, the State moved, under N.J.R.E. 104(c), to admit defendant's inculpatory statement. The trial court held testimonial hearings and issued a written opinion granting the State's motion after concluding that defendant "voluntarily, knowingly, and intelligently waived his right against self-incrimination."

In March 2023, defendant pled guilty to: second-degree conspiracy to commit carjacking; first-degree carjacking; second-degree conspiracy to

---

[1] Defendant and co-defendants were charged with: (count one) first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2, 2C:11-3a(1), (2); (count two) first-degree murder, N.J.S.A. 2C:11-3a(1), (2); (count three) second-degree conspiracy to commit carjacking, N.J.S.A. 2C:5-2, 2C:15-2a(1), (2); (count four) first-degree carjacking, N.J.S.A. 2C:15-2a(1); (count five) first-degree carjacking, N.J.S.A. 2C:15-2a(2); (count six) second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2, 2C:15-1a(1); (count seven) first-degree felony murder, N.J.S.A. 2C:11-3a(3); (count eight) first-degree robbery, N.J.S.A. 2C:15-1a(1); (count nine) second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5b(1); (count ten) second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4a; and (count eleven) third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4a(2).

commit robbery; first-degree robbery; and second-degree unlawful possession of a weapon. Pursuant to the plea agreement, the State recommended: an aggregate twenty-five-year prison sentence, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2 and dismissal of the remaining charges; and for defendant's previous sentence in a separate unrelated case to be served concurrently. The trial court sentenced defendant in accordance with the plea agreement; however, defendant reserved the right to appeal the statement's admissibility.

On appeal, defendant raises the following for our consideration:

> I. THE TRIAL COURT SHOULD HAVE DENIED THE STATE'S MOTION TO ADMIT [DEFENDANT'S] CUSTODIAL STATEMENTS.
>
>> A. THE STATE CONCEDED [DEFENDANT] WAS IN CUSTODY, SO THE DETECTIVES WERE REQUIRED TO FOLLOW THE FULL ARRAY OF PROTECTIONS AGAINST SELF-INCRIMINATION.
>>
>> B. DURING THE SECOND INTERROGATION, THE DETECTIVES FAILED TO SCRUPULOUSLY HONOR [DEFENDANT'S] REPEATED INVOCATIONS OF HIS RIGHT TO SILENCE, SO HIS SUBSEQUENT INCULPATORY STATEMENTS SHOULD HAVE BEEN SUPPRESSED.
>>
>> C. [DEFENDANT'S] LATER REINITIATION AND WAIVER WERE

INVALID BECAUSE, AFTER IGNORING HIS REPEATED INVOCATIONS OF HIS RIGHT TO SILENCE, THE DETECTIVES IMPROPERLY DECEIVED HIM ABOUT THE "TRUE STATUS" OF HIS LEGAL CHARGES TO PRESSURE HIM TO CONFESS.

Unpersuaded, we affirm.

## I.

We summarize the pertinent facts and events as we glean them from the motion record where New Jersey State Police Detective Marcello Pirez, the lead detective in the case, was the sole witness.

On Thanksgiving night, November 23, 2017, defendant, co-defendants, and a juvenile were walking through Newark intending to steal a car. The group spotted Shuri Henry unloading bags from her vehicle while a young child sat on the steps of her home. Defendant, armed with a "black and grey automatic handgun," approached Ms. Henry and attempted to rob her. Henry, who appeared "threatened by [the] group," began to panic and after pressing the alarm button on her key fob, was shot and killed by one of the co-defendants. Thereafter, defendant, co-defendants, and the juvenile grabbed Henry's keys and pocketbook, jumped into her vehicle, and drove off.

A-2955-23

On November 30, 2017, defendant was arrested for an unrelated parole violation and taken to the Essex County Prosecutor's Office ("ECPO") to be interrogated by the Homicide Task Force. At that time, two co-defendants had already been arrested. Upon arrival, Detective Pirez provided defendant with a sandwich and something to drink. Over the next two hours and twenty minutes, Detective Pirez and his partner, Detective Wilfredo Perez, conducted three custodial interrogations with defendant.

A.

At 10:25 a.m. Detectives Pirez and Perez entered the interrogation room and stated they worked for the ECPO Homicide Task Force. Defendant was informed they "want[ed] to discuss . . . a homicide that occurred at 306 South 20th Street in Newark." Detective Pirez reviewed the Miranda[2] warnings form and defendant confirmed he understood each right. As the detectives explained the waiver form, the following exchange ensued:

> [Defendant]: It's me waiving my right — no. I don't want to waive my rights.
>
> Det. Pirez: What do you mean by that?
>
> [Defendant]: No. I want a — a lawyer or somebody to speak to. I don't — no I can't — I need a lawyer or a somebody.

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-2955-23

Det. Pirez:  Okay.  So, you're requesting your attorney at this time?

[Defendant]:  Yes.

Subsequently, the detectives had defendant write "refused" on the form. The detectives left the interrogation room at 10:31 a.m. and turned off the recording devices.  Detective Pirez then returned to his desk, "approximately 10 to 15 feet" away from the interrogation room and informed the assistant prosecutor of defendant's invocation.

## B.

Roughly fifteen minutes later, defendant knocked on the door of the interrogation room and informed Detective Pirez that he wanted to speak with the detectives.  They turned the recording devices on and reentered the room at 11:04 a.m.  Upon reentering the room, defendant confirmed he had reinitiated contact with the detectives:

> Det. Pirez:  . . . you indicated that you wished to speak to us so we came back in this room to speak to you.  Is that correct?
>
> [Defendant]:  Yeah — yeah.
>
> Det. Pirez: Okay.  Did — before when we were reading you your [Miranda] [r]ights, you indicated that you requested an attorney at that time.  At this time do you wish to have an attorney present or do you wish to talk to us?

A-2955-23

[Defendant]: Talk . . . to you.

Defendant confirmed he had neither been threatened nor forced to change his mind and reengage with the detectives.

Defendant again was informed that the detectives were "going to ask [him] certain questions regarding a homicide that occurred on November 23, 2017 at 303 South 20th Street, Newark, New Jersey." Moreover, defendant was advised of each individual Miranda right, confirmed he understood those rights, and initialed next to each right on the form. When the detectives began discussing the waiver form, defendant stated: "I don't really want to take my chances." Nevertheless, he confirmed he understood the waiver form and its implications. The detectives then asked defendant to sign the waiver form, to which he responded: "I really want to take my chances, man. I'm tired. . . . Is this me doing this? This makes me — telling — saying I'm — I was there, everything. I know. No, no. No. I can't — I can't." Accordingly, the detectives offered to clarify any Miranda or waiver questions defendant may have had.

Defendant then inquired as to whether Detective Pirez's cell phone, which was located on the table, was recording. Both detectives assured defendant the cell phone was not recording; however, they failed to inform defendant that the room was being audio and video recorded. Nevertheless, the detectives

7

informed defendant that they could not proceed unless he waived his rights and, to ensure he understood his rights fully, Detective Pirez re-read the waiver form to defendant. Subsequently, the following colloquy occurred:

> [Defendant]: I'm — I'm sorry, but — but just take me to the jail, please. Because I'm not — .
>
> . . . .
>
> Det. Pirez: Okay. No problem. So, you're refusing to – you don't – you don't want to speak to us?
>
> [Defendant]: Yeah. I'm sorry, you all. I'm sorry.

The detectives then requested that he write refused on the waiver form. Although defendant attempted to clarify his reluctance to provide a statement, the detectives informed him they could not answer any questions unrelated to his Miranda rights or the waiver form.

Defendant then asked: "So, basically, I'm being . . . — arrested for this and not questioned?" To which Detective Perez responded: "Right. You're being charged with homicide." Detective Pirez continued, "[w]e're not . . . going to ask you questions in reference to anything or do anything like that, you know, because you elected not, you know, not to do so. We respect that, obviously. And . . . that's your right."

8

At 11:18 a.m., the Detectives concluded the interview, left the interrogation room, and turned off the recording devices. Detective Pirez then returned to his desk, near the interrogation room and again informed the assistant prosecutor that defendant had invoked his right to silence.

Detective Pirez testified that defendant had not been charged with homicide at that point. He explained that he didn't have authority to charge defendant irrespective of whether he made a statement but had to get permission from the assistant prosecutor to file charges. Detective Pirez confirmed that he did not seek approval for charges until after the third statement.

C.

Approximately a half-hour later, defendant again knocked on the door of the interrogation room and "indicated that he wished to speak to [the Detectives]." The recording devices were turned on and the Detectives reentered the room at 11:54 a.m.

For the third time, Detective Pirez reviewed the Miranda form with defendant—who said he understood each right and initialed the form. Defendant signed the waiver form at 11:58 a.m. and acknowledged that he was neither forced nor threatened to speak with the detectives. Defendant then provided an inculpatory statement to the detectives, which detailed: (1) on Thanksgiving

9

night, November 23, 2017, defendant and three others were looking for a car to steal or someone to rob; (2) they spotted a woman, accompanied by a child, unloading bags out of a red Jeep; (3) defendant, who was provided a gun by one of the other individuals, approached the woman and demanded money; (4) disgruntled with how long things were taking, one of the other assailants took the gun from defendant and demanded the woman hurry up; (5) the woman, frightened and panicked, attempted to remove her house key from her key chain but pressed the car alarm button; (6) one of the others shot the woman and instructed the rest of the group to "grab the stuff"; and (7) the group jumped into the Jeep, drove off, and defendant was dropped off near his home.

Defendant then stated: "I want to delete the whole — the whole thing I just said. I want to delete everything." He also told the detectives: "That whole thing, I was just lying. The whole thing I was lying." Thus, the detectives concluded the interrogation at 12:45 p.m.; however, as they were leaving the room, defendant stated: "I'm intoxicated. Under the influence." The detectives left the room, the recording devices were turned off, and defendant was not interrogated again.

D.

A-2955-23

Following Detective Pirez's testimony, the court granted the State's motion to admit defendant's statement and issued a written decision and order. The court determined that Detective Pirez was a credible witness based on his testimony having been "consistent throughout, reasonable, and . . . spoke[n] in a clear, calm voice." Additionally, the court made factual and legal determinations regarding each of defendant's three custodial interrogations.

First, the court determined that during defendant's first custodial interrogation he "invoked his right to an attorney and detectives thereafter properly ended the interrogation."

Second, the court determined that defendant did indeed reinitiate with the detectives; however, that "initiation did not constitute a knowing, intelligent, and voluntary waiver of his rights." The court found that although defendant's statements "indicate[d] . . . that he did not wish to speak," his "words reflect[ed] an ambiguous intent to invoke his right." Accordingly, the court held the detectives were permitted to ask defendant clarifying questions. Moreover, the court found the detectives' clarifying questions were permissible because they could "reasonably be interpreted as attempting to figure out whether [d]efendant was willing to talk . . . or if [d]efendant simply wanted to stop talking completely." The court also noted that the detectives "properly ended the second

11

interrogation[]" after clarifying defendant's invocation of his right to silence. Further, the court acknowledged that defendant was told he was being charged with homicide before a charging document or arrest warrant was issued; thus, the court concluded, defendant was aware "of his 'true status' as a suspect in a homicide."

Third, the court held that defendant's waiver during his final custodial interrogation was knowingly, voluntarily, and intelligently given. Thus, under the totality of the circumstances, defendant's statement was admissible. Furthermore, the court rejected defendant's assertion of being intoxicated and found: (1) defendant's statement was not credible; (2) there were no indications that defendant was intoxicated; (3) it appeared defendant regretted his decision to give a statement and sought to discredit the statement by claiming to be intoxicated; and (4) Detective Pirez credible that his training and experience lead him to conclude defendant did not appear to be under the influence of alcohol, drugs, or narcotics.

II.

We begin our analysis by acknowledging the legal principles governing this appeal. Where, as here, we are tasked with reviewing a grant or denial of a motion to suppress a statement, we apply a deferential standard of review to the

12

trial court's findings of fact. State v. S.S., 229 N.J. 360, 379-80 (2017); see also State v. Prall, 231 N.J. 567, 580 (2018) (quoting Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)) ("the trial court's evidentiary rulings 'are reviewed under the abuse of discretion standard.'"). Although we accept the trial court's factual findings insofar as they are supported by sufficient credible evidence, S.S., 229 N.J. at 381 (citing State v. Gamble, 218 N.J. 412, 424 (2014)), we are not bound by the trial court's interpretations of the legal consequences that flow from the established facts, Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995); State v. Harris, 457 N.J. Super. 34, 43-44 (App. Div. 2018). Accordingly, the trial court's legal conclusions are reviewed de novo. See State v. Bullock, 253 N.J. 512, 532 (2023) (quoting State v. Hubbard, 222 N.J. 249, 263 (2015)); see also State v. Handy, 206 N.J. 39, 45 (2011) (finding that whether the facts warrant suppression is a "purely . . . legal question").

Next, we acknowledge that "[t]he right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." S.S., 229 N.J. at 381-82 (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). In Miranda, the United States Supreme

Court "determined that a custodial interrogation by law enforcement officers is inherently coercive, automatically triggering the Fifth Amendment privilege against self-incrimination." State v. P.Z., 152 N.J. 86, 102 (1997) (citing Miranda, 384 U.S. at 444). Notably, our Supreme Court has emphasized that "[New Jersey's] common law privilege against self-incrimination affords greater protection to an individual than that accorded under the federal privilege." State v. Vincenty, 237 N.J. 122, 132 (2019) (quoting In re Grand Jury Proceedings of Guarino, 104 N.J. 218, 229 (1986)).

III.

Defendant first asserts the detectives failed to "follow the full array of protections" under Miranda. We disagree. Indeed, "the State has the affirmative duty to prove . . . by proof beyond a reasonable doubt[] . . . that the defendant's statement was voluntary and, if custodial, that the defendant was advised of his rights and knowingly, voluntarily, and intelligently waived them." State v. W.B., 205 N.J. 588, 602 n.3 (2011) (citing State v. Yough, 49 N.J. 587, 595 (1967); N.J.R.E. 104(c)).

The State concedes that defendant was subjected to custodial interrogation; thus, the crux of the inquiry is whether defendant's statement was the result of an overborne will. See State v. Galloway, 133 N.J. 631, 655 (1993)

(citing State v. Miller, 76 N.J. 392, 405 (1978)). Though we remain cognizant of the inherent coercive nature of custodial interrogation, we nevertheless reaffirm that "[e]fforts by a law enforcement officer to persuade a suspect to talk 'are proper as long as the will of the suspect is not overborne.'" State v. Maltese, 222 N.J. 525, 544 (2015) (quoting Miller, 76 N.J. at 403); see also State v. Di Frisco, 118 N.J. 253, 257 (1990) (finding officers "encouragement of trust" did not render the confession involuntary).

> In determining whether a suspect's confession is the product of free will, courts traditionally assess the totality of the circumstances surrounding the arrest and interrogation, including such factors as "the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature[,] and whether physical punishment or mental exhaustion was involved." Additionally, "[a] suspect's previous encounters with law enforcement has been mentioned as [a] relevant factor."
>
> [State v. Presha, 163 N.J. 304, 313 (2000) (quoting Miller, 76 N.J. at 402) (internal citations omitted) (emphasis added).]

The detectives provided defendant with the full array of his Miranda rights and his subsequent waiver was knowingly, voluntarily, and intelligently given. Defendant was properly Mirandized on three separate occasions and before the third interrogation, where defendant provided an inculpatory statement, the

15

detectives accurately read and explained the <u>Miranda</u> waiver form.  Further, defendant confirmed that his decision to provide an inculpatory statement was not the result of an overborne will:

> Det. Pirez:  . . .  as far as some of the questions I have for you before I get into that, I don't — you know, you knocked on the door.  You wanted us to come back in here and speak to you.  Is that correct?
>
> [Defendant]:  Yes.
>
> Det. Pirez:  Okay.  And as far as that goes, did anybody threaten you?  Did anybody come in here and beat you up . . . or force you to do that or, you know (indiscernible) to come and talk to you?
>
> [Defendant]:  No.

In looking at the totality of the circumstances, we conclude defendant's statement was knowingly, voluntarily, and intelligently given because:  (1) defendant's age is not at issue considering he was in his late twenties at the time of his custodial interrogations; (2) defendant graduated high school, appears to be of average intelligence, and does not allege his education or intelligence played a factor in his decision to provide a statement, <u>see</u> <u>State v. Carpenter</u>, 268 N.J. Super. 378, 385 (App. Div. 1993) (holding, even though "defendant [was] illiterate, ha[d] an I.Q. of 71, and left school at 18[,]" they were capable of understanding the <u>Miranda</u> warnings); (3) the detectives verbally advised

16

defendant of his <u>Miranda</u> rights and the waiver form three times, <u>see</u> <u>State v. A.M.</u>, 237 N.J. 384, 400 (2019) (discussing how reading the <u>Miranda</u> and waiver forms aloud ameliorates issues regarding a suspect's ability to understand); (4) defendant's interrogations were cumulatively just over two hours, <u>see</u> <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 397-99 (2010) (finding a suspect's waiver voluntary despite him maintaining silence for two hours and forty five minutes); (5) the only repeated questions asked by the detectives were for purposes of clarification; (6) the record does not show, nor does defendant allege, that the detectives subjected him to physical punishment, <u>see</u> <u>State v. Knight</u>, 183 N.J. 449, 468 (2005) (quoting <u>P.Z.</u>, 152 N.J. at 115) (finding that without threats or police misconduct, even a defendant's "subjective fear" is insufficient to create a Fifth Amendment violation); and (7) defendant's history with the criminal justice system, including eleven arrests and three indictable convictions, implies he fully understood his <u>Miranda</u> rights and the waiver process, <u>see</u> <u>Galloway</u>, 133 N.J. at 656-57 (considering, among other things, a defendant's prior experience with police as relevant to the voluntariness of their waiver although the defendant had only "some minimal experience").

The privilege against self-incrimination includes "'the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own

free will and to suffer no penalty . . . for [] silence.'" State v. Camacho, 218 N.J. 533, 543 (2014) (quoting P.Z., 152 N.J. at 100-02). Upon review of the record and the recordings of defendant's interrogations, we find defendant's inculpatory statement resulted from an unfettered exercise of his own free will.

IV.

Next, defendant argues "the detectives failed to scrupulously honor [his] repeated invocations of his right to silence[]." We are unpersuaded. Per Miranda, scrupulous adherence requires that the interrogation cease if the suspect "indicates in any manner, at any time prior or during questions, that he wishes to remain silent[.]" 384 U.S. at 473-74. See also State v. Gonzalez, 249 N.J. 612, 628 (2022); State v. Wessells, 209 N.J. 395, 402 (2012); State v. Wright, 97 N.J. 113, 126 (1984). However, our Supreme Court has articulated that where an invocation of the right to silence is ambiguous, law enforcement must either "(1) terminate the interrogation or (2) ask only those questions necessary to clarify whether the defendant intended to invoke his right to silence." S.S., 229 N.J. at 383 (citing State v. Johnson, 120 N.J. 263, 283 (1990)). Notably, where a defendant's invocation is ambiguous "clarification is not only permitted but needed." State v. Alston, 204 N.J. 614, 624 (2011). Clarifying questions are impermissible if they "operate to delay, confuse, or

burden the suspect in his assertion of his rights." Johnson, 120 N.J. at 283 (quoting Christopher v. Florida, 824 F.2d 836, 842 (11th Cir. 1987)).

We recognize that where a defendant's invocations of their Miranda rights are not scrupulously honored, subsequent statements following waivers may be deemed involuntary and inadmissible. See State v. Wade, 252 N.J. 209, 219 (2022); State v. Dorff, 468 N.J. Super. 633, 646 (App. Div. 2021). Nevertheless, we find, in accordance with the trial court's written decision, that in defendant's second statement, he ambiguously invoked his right to counsel—which necessitated clarifying questions—and the detectives concluded the interrogations once defendant's invocation of his rights was unambiguous.

Regarding the first interrogation, the record shows defendant was read each individual Miranda right and confirmed he understood each right. When the detectives began discussing the waiver form with him, however, he stated: "No. I want . . . a lawyer or somebody to speak to. I don't — no I can't — I need a lawyer or somebody." The detectives then clarified: "Okay. So, you're requesting your attorney at this time?" When defendant responded "yes[,]" the detectives concluded the interview. Thus, the detectives did scrupulously honor defendant's invocation in the first interrogation by "terminating all questioning 'until counsel has been made available [or] unless the accused [] initiates further

A-2955-23

communication, exchanges, or conversations with the police.'" State v. Chew,

150 N.J. 30, 61 (quoting Edwards v. Arizona, 451 U.S. 477, 484-85 (1981))

(emphasis added).

In the second interrogation, after defendant reinitiated with the detectives,

he again invoked his rights in an ambiguous fashion. We hold, similar to the

trial court, that the following colloquy demonstrated an ambiguous invocation

succeeded by neutral clarifying questions:

> [Defendant]: "Yeah. But — . . . they said I got to explain, I got to talk. I don't have to – I don't know man. I can't — I can't — I can't. I'm sorry. I can't — I can't — I can't. I'd rather take my chances. I'd rather take my chances.[3]
>
> Det. Perez: Do you feel like you want to ask us some questions? Is that it? Is that's . . . what's holding you back?
>
> . . . .
>
> Det. Perez: . . . and just hear me out. Even if you answer this and say, yeah, you know and then later on as we're talking you feel like, you want to stop, then

---

[3] This ambiguous invocation is analogous to one made in Johnson, where the officers were permitted to ask qualifying questions after the suspect stated: "I can't talk about it." 120 N.J. at 284. See also State v. Gonzalez, 249 N.J. 612, 631-32 (2022) (finding "[b]ut what do I do about an attorney and everything?" to be an ambiguous invocation requiring clarification); State v. Cardona, 268 N.J. Super. 38, 43-46 (App. Div. 1993)(noting "[n]o, for what? No, with what money, I have no money . . . ." was not an unambiguous assertion of the right to counsel).

A-2955-23

you . . . could stop.  You understand?  You understand what I'm telling you?  At any given time – just because you signed it once . . . we put it to the side, doesn't mean you could – you can't go back to it and say, hold up. You know, maybe . . . I want to take the [Miranda] . . . and . . .  I want to stop right now.  Okay?  But — and that's your prerogative.  I'm not telling you what to do. All I'm saying is for us to proceed from this point forward, you know what I'm saying, like for us to understand each other a little bit better, we have to go through the [Miranda] and you have to understand what it means which you already.  I'm pretty sure you already do.  But, we – I can't answer any – like, . . . I wish could keep conversating with you, but we can't.  Not – not –

[Defendant]:  Until I waive my rights?

Det. Perez:  — not until — yeah.  And then at that point, you know, if you're not comfortable with the questions we're asking you, then . . . you do what you do.

Following that discussion, the detectives again reviewed the waiver form with defendant and inquired whether he had any questions they could clarify regarding the form.  Defendant then stated:  "I'm – I'm sorry, but – but just take me to the jail, please."  After again clarifying that defendant could stop his statement at any time, Detective Pirez clarified defendant did not wish to give a statement, requested he write refused on the waiver form, informed defendant they could not answer any non-Miranda related questions, and concluded the interview.

21

A-2955-23

Per State v. Rivas, ambiguous invocations permit law enforcement to "make[] additional neutral inquiries that clarify that the suspect desires to waive his right to counsel." 251 N.J. 132, 154 (2023) (citing Alston, 204 N.J. at 624). The detectives' attempts to clarify were neutral because they did not seek to illicit incriminating information; instead, the detectives' questions and comments only sought to: (1) ensure defendant understood his Miranda rights and the waiver form; and (2) clarify whether defendant intended to invoke his Fifth Amendment rights. Accordingly, we hold the detectives' conduct comports with the requirements imposed on law enforcement pursuant to S.S. See S.S., 229 N.J. at 383 (citing Johnson, 120 N.J. at 283-84).

V.

Lastly, defendant asserts that his subsequent waiver during the third interrogation should have been rendered inadmissible because he was deceived regarding his true legal status. Specifically, defendant argues that the detectives telling him he was "being charged with homicide" during the second interrogation, before any formal charges or an arrest warrant, was a misrepresentation of his true legal status. We are unpersuaded.

Although police action may undermine the voluntariness of a confession, "we continue to consider the totality of the circumstances to decide whether the

State has proven beyond a reasonable doubt that a defendant knowingly, intelligently, and voluntarily waived his rights." State v. O.D.A.-C., 250 N.J. 408, 423 (2022) (citing State v. Sims, 250 N.J. 189, 211 (2022)). On this basis, the Court in O.D.A.-C. expressly "decline[d] to adopt a bright-line rule that would require suppression any time an officer makes an improper comment during an interrogation." Ibid.; see also State v. Puryear, 441 N.J. Super. 280, 296, 300-01 (App. Div. 2015) (finding, despite the defendant being improperly Mirandized in a prior interrogation—thus warranting suppression—there was "no reversible error in the trial court's decision to admit [his subsequent] statement").

While courts have historically recognized that misrepresentations made by police officers are relevant to the totality of the circumstances analysis, "misrepresentations alone are usually insufficient to justify a determination of involuntariness or lack of knowledge." State v Cooper, 151 N.J. 326, 355 (1997) (internal citations omitted). Instead, a confession is deemed involuntary insofar as the misrepresentation made by the officer(s) "actually induced the confession." Ibid. Contrast State v. Roach, 146 N.J. 208, 226-27 (1996) (finding that although the defendant was likely misled as to whether he was being questioned as a witness and not a suspect, "defendant's inculpatory

statement was [not] extracted by basically unfair means"); with State v. Reed, 133 N.J. 237, 240-43 (1993) (rendering a confession inadmissible where the police precluded a defendant from corresponding with his attorney by misleading the attorney and the defendant as to the defendant's suspect status in the investigation).

Ultimately, the question of waiver is determined in "the totality of the circumstances surrounding the custodial interrogation." State v. Tillery, 238 N.J. 293, 316 (2019) (quoting A.M., 237 N.J. at 398). Moreover, the totality of the circumstances analysis requires courts to look not just to the language used by law enforcement, but to the surrounding facts and circumstances as well. See State v. Kremens, 52 N.J. 303, 311 (1968). Accordingly, even where improprieties may exist, the question is whether the error is "harmless beyond a reasonable doubt." Tillery, 238 N.J. at 319; see also State v. Maltese, 222 N.J. 525, 550 (2015) (utilizing the harmless beyond a reasonable doubt standard to determine if a defendant's Miranda rights were violated); S.S., 229 N.J. at 381 (requiring the admission of evidence be "so clearly mistaken" that the "interests of justice demands intervention); R. 2:10-2 ("any error . . . shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result.").

Indeed, where the police use trickery to induce a statement the suspect's waiver may be deemed involuntary. See Nyhammer, 197 N.J. at 407 (citing Miranda, 384 U.S. at 476). Further, the use of fabricated evidence to induce a waiver is equally improper. See e.g., State v. Chirokovskcic, 373 N.J. Super. 125, 133-34 (App. Div. 2004) (finding that fabrication of evidence diminishes confidence in the voluntariness of a confession); State v. Patton, 363 N.J. Super. 16, 46 (App. Div. 2003) (holding that where a confession stems from fabricated evidence, it is per se inadmissible). As we previously articulated in State v. Diaz:

> We draw a fundamental distinction between police trickery with respect to the strength of the evidence against an interrogee on the one hand, and trickery with respect to an interrogee's "true status" within the meaning of [State v. A.G.D., 178 N.J. 56, 68 (2003)],[4] on the other hand. Misleading a defendant about the seriousness of the offense(s) for which he or she was arrested is, in our view, qualitatively different from misleading a defendant about the factual evidence of his or her guilt. Stated differently, police are allowed to use certain forms of trickery while posing substantive questions following a knowing and voluntary Miranda waiver. Such trickery is designed to induce an interrogee who has already waived his or her Miranda rights to make factual statements that constitute incriminating admissions. We are aware of

---

[4] In A.G.D., the Supreme Court imposed, as an additional requirement to police interrogations, "the basic requirement to inform an interrogatee that a criminal complaint or arrest warrant has been filed or issued." 178 N.J. at 68-69.

A-2955-23

no precedent, however, that authorizes trickery as part of the waiver process, that is, trickery designed to induce a person to yield his or her right to remain silent and consult with an attorney before answering substantive questions. Indeed, Miranda itself explains to the country that 'any evidence that the accused was . . . tricked . . . into a waiver will, of course, show that the defendant did not voluntarily waiver his [or her] privilege.' 384 U.S. at 476.

[State v. Diaz, 470 N.J. Super. 495, 525 (App. Div. 2022) (emphasis added).]

Notably, however, the facts here are distinguishable from Diaz. In Diaz, the defendant was found to have been misled as to his true legal status because he was "provid[ed] a deliberately vague and incomplete answer as to the reason he was taken into custody." 470 N.J. Super. at 518. Specifically, the defendant in Diaz was told Detectives were doing a narcotics investigation when, in actuality, they were conducting a homicide investigation. Id. at 505-06.

Defendant was at all relevant times aware of the seriousness of the offense—he was informed more than three times that the Detectives wanted to discuss the November 23, 2017 homicide. This conforms with our Supreme Court's comments in Vincenty: "call[ing] for law enforcement officials to make a simple declaratory statement at the onset of an interrogation that informs a defendant of the essence of the charges filed against him." 237 N.J. at 134. Certainly, we recognize that at the time the detectives answered defendant's

26

question and told him he was being charged with homicide there were no official charges. This is one factor in the totality of the circumstances analysis. However, defendant was nevertheless aware, from the onset of the first interrogation, that the detectives had questions regarding a homicide. Thus, defendant was not "misl[ed] about the seriousness of the offense" in a manner analogous to Diaz. 470 N.J. Super. at 525.

Our review of the case law leads us to the conclusion that appraisal of one's "true legal status" requires that law enforcement does not diminish the seriousness of the charges or allegations against a defendant. See e.g., State v. Cooper, 151 N.J. 326, 355-56 (1997) (upholding a confession as voluntary despite the police's failure to inform defendant the offense was death penalty eligible); A.G.D., 178 N.J. at 68 (invalidating a waiver because the police never told the suspect they were in possession of a criminal complaint and arrest warrant for him); Diaz, 470 N.J. Super. at 514-15 (stating "the suspect must be informed of the nature and seriousness of the charges."); Vincenty, 237 N.J. at 134 (holding that failure to disclose charges filed against a suspect inhibited the ability to "understand . . . the heightened magnitude of the interrogation"). No such diminishment of the seriousness of the allegations against defendant

A-2955-23

occurred here. Defendant was always aware of his true legal status as a suspect in a homicide investigation.

The record is devoid of any attempt by the detectives to overbear defendant's will by answering his question about being charged. Nor is there evidence that Detective Perez's words compelled defendant to reinitiate a conversation at the third interview. Rather, defendant stated his decision to speak was voluntary and he was not forced to speak with the detectives. He received new warnings. The totality of the circumstances supports the court's conclusion that the State proved beyond a reasonable doubt that defendant knowingly and validly waived his rights and gave an admissible statement.

To the extent we have not addressed any arguments raised by defendant, they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division